EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
MARK S. HOWELL
Deputy Attorney General
State Bar No. 95125
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-3664
  Telephone: (415) 703-5969
  Fax: (415) 703-1234
  Email: mark.howell@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **JESSE ZUNIGA,** | C-07-4319 PJH (PR) |
| Petitioner, | |
| **v.** | |
| **TOM FELKER, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MARK S. HOWELL
   Deputy Attorney General
6  State Bar No. 95125
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5969
8    Fax: (415) 703-1234
     Email: mark.howell@doj.ca.gov
9  Attorneys for Respondent

10        IN THE UNITED STATES DISTRICT COURT

11       FOR THE NORTHERN DISTRICT OF CALIFORNIA

12           SAN FRANCISCO DIVISION

13

14  **JESSE ZUNIGA,**                          C-07-4319 PJH (PR)

15                          Petitioner,    **MEMORANDUM OF POINTS
                                           AND AUTHORITIES IN
                                           SUPPORT OF ANSWER TO
16        **v.**                            PETITION FOR WRIT OF
                                           HABEAS CORPUS**
    **TOM FELKER, Warden,**
17
                          Respondent.
18

19

20              **STATEMENT OF THE CASE**

21        The District Attorney of Santa Clara County charged petitioner as follows:  count one -

22  first degree robbery of Amy Guray while inside an inhabited dwelling, and in concert with at least

23  two other persons, Cal. Pen. Code § 213(a)(1)(A)[1]; count two - assault upon Amy Guray with a

24  deadly weapon, Pen. Code § 245(a)(1); count three - first degree robbery of Salvador Lopez while

25  inside an inhabited dwelling, and in concert with at least two other persons, Pen. Code §

26  213(a)(1)(A); count four - assault upon Charlotte Reinthaler with a deadly weapon, Pen. Code  §

27  ─────────────────────────────────────────
         1.  Subsequent references to the Penal Code are to the California Penal Code.
28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

                              1

1   245(a)(1); count five - dissuading or attempting to dissuade a witness, Amy Guray, by the use of

2   force or threat of force, Pen. Code § 136.1(c)(1).  CT 174-82, 184; RT 237-38.[2/]

3         Attached to counts one and three were enhancements charging petitioner with personal

4   use of a handgun, Pen. Code § 12022.53(b); with having been a principal in an offense wherein at

5   least one principal personally used a firearm, Pen. Code § 12022.53, subds. (b) and (e)(1); and with

6   having committed the charged offenses for the benefit of, at the direction of, and in association with

7   a criminal street gang, Pen. Code § 186.22(b)(4).  Attached to count two were enhancements

8   charging petitioner with personal use of a firearm, Pen. Code §§ 1203.06, 12022.5(a)(1) and a gang

9   enhancement, Pen. Code § 186.22(b)(1).  CT 174-82, 184.  Also attached to count four were

10  enhancements charging petitioner with personal use of a firearm, Pen. Code § 12022.5(a)(1), and

11  a gang enhancement, Pen. Code § 186.22(b)(1).  Attached to count five was an enhancement

12  charging petitioner with personal use of a firearm, Pen. Code § 12022.5(a).  CT 174-82, 184; RT

13  237-38.

14        On July 7, 2003, the trial court granted the motion to bifurcate the trial of the gang

15  enhancements.  RT 247-48; *see* CT 184; RT 241.  On the People's motion, the trial court dismissed

16  count five (dissuading a witness).  CT 191; RT 247-48.

17        A jury was sworn on July 10, 2003.  CT 199-200; RT 492, 501.  Trial commenced the

18  following day.  CT 203; RT 533.

19        On July 15, 2003, petitioner moved for judgment of acquittal as to count four (assault upon

20  Reinthaler), and the trial court granted the motion.  CT 212; RT 874-75.

21        The jury began deliberations on July 21, 2003.  CT 250; RT 1270.  Later that day, the jury

22  returned verdicts finding petitioner guilty of counts one, two, and three.  It also found true the

23  allegations attached to counts one and three that petitioner had personally used a firearm, Pen. Code

24  § 12022.53(b), and that he had been a principal and at least one principal had personally used a

25  firearm in the commission of those charged offenses, Pen. Code § 12022.53, subds. (b) and (e)(1).

26  

27        2. The information provided in the clerk's transcript shows that co-defendant Herrera was
     charged in count five, CT 175, 181, but the charge was later amended to identify petitioner as the
28   defendant in that count.  CT 184; *see* RT 237-38.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1    The jury further found that, in count two, petitioner had personally used a firearm, Pen. Code §

2    12022.5(a)(1).  CT 240-249, 251; RT 1275.

3         On July 22, 2003, trial commenced as to the bifurcated gang enhancements attached to

4    counts one, two, and three.  CT 346-47; RT 1283; *see* RT 1275-77.  The jury returned true findings

5    as to all three gang enhancements.  CT 343-46, 349; RT 1363-65.

6         On February 18, 2004, petitioner moved for a new trial.  CT 402-11.  On March 4, 2004,

7    the trial court denied the motion.  CT 451; RT 1397-1402.

8         Immediately thereafter, the court sentenced petitioner.  For count one (robbery of Guray),

9    the court imposed 15 years to life, plus a consecutive determinate term of ten years for the personal

10   use of a firearm, Pen. Code § 12022.53(b).  For count two (assault upon Guray) and its

11   enhancements, the court imposed a 12-year combined term, but then the court stayed sentencing for

12   count two pursuant to Penal Code section 654.  For count three (assault upon Lopez), the court

13   imposed 15 years to life, plus a consecutive determinate term of ten years for the personal use of a

14   firearm, Pen. Code § 12022.53(b).  The sentence terms for count one and its enhancement were

15   ordered to run concurrently with the sentence terms for count three and its enhancement, so that

16   appellant's aggregate term was 15 years to life, plus a determinate term of ten years.  CT 451-54;

17   RT 1405-08.

18        On February 26, 2007, the California Court of Appeal filed an unpublished opinion,

19   affirming the judgment.  Exh. Z.  Petitioner filed a petition for rehearing, Exh. AA, which was

20   denied.  Exh. BB.

21        Petitioner filed a petition for review in the California Supreme Court.  Exh. CC.  That

22   court, acting en banc, summarily denied review on May 16, 2007, without any written opinion or

23   citation to authority.  Exh. DD.

24        Petitioner filed the currently pending petition for writ of habeas corpus in this Court on

25   August 22, 2007.  Dkt. No. 1.  This Court issued an Order on August 27, 2007, Dkt. No. 3,

26   dismissing issues three and four of the petition and directing respondent to file an answer showing

27   cause why a writ of habeas corpus should not be granted on the grounds stated in issues one and two

28   of the petition, which the court characterized in its Order as "asserting that:  (1) admission of certain

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

3

hearsay testimony violated [petitioner's] Confrontation Clause rights as described in *Crawford v. Washington*, 541 U.S. 35 (2004); (2) [petitioner's] Confrontation Clause right were violated by admission of evidence of the guilty pleas of confederates." Order at 2. Respondent hereby files the instant memorandum of points and authorities in support of the answer, which is being filed contemporaneously herewith.

## STATEMENT OF FACTS

**A. The Robberies And The Assault**

On Christmas Eve of 2002, between 10:00 and 10:30 p.m., Charlotte Reinthaler picked up her friend, Salvador Lopez, at his house and brought him to her residence located at 736 East St. James Street in San Jose. RT 551-54, 610, 611-14, 985. When they arrived, Reinthaler's friend of about six or seven months, Guray,[3] was already there. RT 554, 985-86, 1149-50.[4] While they were there, the phone started ringing. RT 555. Petitioner kept calling Reinthaler. RT 987.

Although she had known petitioner for a couple months, RT 988-89, she was not romantically involved with him. She did say that petitioner called her by an affectionate nickname, "Buttercup," and had expressed that he liked her. RT 1054. However, at trial, Reinthaler testified she was dating petitioner's cousin Edmond. RT 1009-10; *see* RT 1054.

Reinthaler testified that Guray had known petitioner for over two months. RT 1160. Guray had told Reinthaler that she liked petitioner and wanted to have a relationship with him, but as far as Reinthaler knew, petitioner and Guray never did have a relationship. RT 1158. In fact, even though Reinthaler, Guray, and petitioner used to hang out and party together, RT 1050, Reinthaler heard Guray say, a couple nights before Christmas Eve, that she (Guray) was angry at

---

3. Ms. Guray is variously identified throughout the record as Amy Garay and Amy Guray.

4. Reinthaler testified that she and Guray were both already there when Lopez came by about 9:00 or 10:00 p.m. RT 986, 1021. She said he brought some "blunts," her word for a marijuana cigar, which they all smoked. Reinthaler said she got high. RT 1021-22, 1032. Lopez acknowledged that he smoked a little marijuana on Christmas Eve, but he was unclear about the time of day or night when he smoked it. RT 608-10, 623, 625-27, 659-60; RT 1032. He said that he was not under the influence of marijuana at the time of the robbery. RT 659. He said he did not think it affected his memory. RT 628. He said that he had two sips of Heineken's beer. RT 611. She added, however, that she and Guray had each drunk a beer before Lopez arrived. RT 1022.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

4

1  petitioner and was going to set him up.  RT 1051.  She also said something to the effect that

2  petitioner had better watch out because she was going to get her home boys.  RT 1158.

3       After Reinthaler had answered the phone several times, RT 554, 615-20, she became

4  exasperated.  RT 987-88.  First, she started hanging up on petitioner, and then, she quit answering

5  it.  Once, Guray answered the phone and hung up.  RT 988.  Reinthaler also asked Lopez to answer

6  the phone the next time it rang.  RT 554-55, 615-17.  She told him that the same person, a male, kept

7  calling.  RT 618.  When the phone rang again, and Lopez answered it, an unidentified male on the

8  other end of the line asked to speak to Reinthaler.  Lopez set the phone down.  Reinthaler got on the

9  phone, talked to the man, and then hung up on him.  RT 555-56, 618-19.  In all, there were about

10  ten incoming calls.  RT 556-57, 988.  Reinthaler had hung up on about half of those calls.  RT 557.

11  A little before midnight, several men approached Reinthaler's door.  RT 556, 591, 615.[5]

12  Lopez and Reinthaler were in the living room, watching movies.  RT 989, 1019.  Guray was in the

13  bathroom, doing her nails.  RT 1019.  Lopez was sitting on a couch opposite the door, about four

14  or five feet away.  RT 558.

15       One of the men outside knocked on the door, and as Reinthaler was about to open the

16  door, the door flew open, and the three men barged in.  RT 559-60, 593-94, 989-90.  Lopez testified

17  that the first one in the door was petitioner.  RT 561.  The other two, whom Lopez also identified

18  in court, were William Siller and Gabriel Herrera.  RT 562.  When the men entered, Lopez could

19  see that Siller had a black semiautomatic handgun.  At that point, Lopez did not know whether any

20  of the other men were armed.  RT 562-63, 629-30.

21       Once inside, Siller pointed his gun at Lopez.  RT 634.  Petitioner seemed crazed, angry,

22  and out of control.  RT 635.  He began yelling that he was from CPL,[6] that he was looking for

23

24  5.  Reinthaler initially said it was probably before midnight.  RT 989.  Later, she said the incident occurred at about 11:00 p.m.  RT 1021.

25

26  6.  At the time, Lopez did not know anything about a San Jose gang called the Capital Park Locos.  RT 6144, 620-21.  Reinthaler knew petitioner to be a member of CPL.  RT 999, 1052.  San

27  Jose Police Officer Gregory Lombardo, whom the parties stipulated to be qualified as a gang investigator, RT 828-30, testified generally about gang life RT 830-33, 835-36), and he gave a brief

28  history about the Capital Park Locos (CPL), who hang out near Capital Park in San Jose.  RT 833.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

"Sandman," and that he was going to kill someone for having shot his car.[7/]  RT 564, 632-33.
Petitioner shoved Reinthaler into the kitchen.[8/]  She landed on her butt.  RT 564-65, 636, 989-90,
992, 1046-48.  Reinthaler yelled, "What are you doing?  Everybody here is cool."  RT 565.  After
that, she never left the kitchen throughout the incident because she was scared.  RT 1002.  She just
cried and screamed.  RT 566.

After that, petitioner and Siller went to the bathroom.  Petitioner kicked in the door and
entered the bathroom.  RT 566, 595;  RT 994, 996.  Guray was in the bathroom at the time.
According to Lopez, she had gone there shortly before the intruders entered the house, but she did
not close the door until after they had entered the house.  RT 567, 637-38; RT 996.  After petitioner
entered the bathroom, Lopez could hear Guray was crying.  RT 567-68.  Reinthaler heard banging
and loud noises coming from the bathroom.  She also heard some arguing, and she heard Guray
yelling and screaming.  RT 992-93, 996, 997, 1002-03.  Petitioner and the gunman, Siller, stayed
in the bathroom for a matter of seconds.  RT 568, 595.  At trial, Reinthaler testified that she was
aware that a purse belonging to Guray had been at the house before the intruders arrives, but it was
missing after they left.  RT 1003.

Meanwhile, Herrera was standing at the front door as a lookout while Lopez remained near
the couch.  RT 568-69, 644.  When petitioner and Siller came back from the bathroom, petitioner

He said that gangs thrive on intimidation, violence, and threats of violence.  He testified that if a
gang member were to have yelled out CPL during the incident here, that person would be doing so
to let everyone know that he is associated with that gang, that the gang is crazy, and the gang is
responsible for the violence, so other people will not mess with CPL for fear of retaliation.  RT 834.

7.  Reinthaler testified that the only time she heard petitioner say something about his car
window having been shot out was when he called her on the telephone, prior to the intrusion.  He
told her that an undercover policeman had shot out his rear window.  RT 997-98.

8.  Reinthaler just described the person who pushed her as the first man who entered the
house.  At trial, she said she could not say that petitioner was among the three persons who entered
her house.  RT 990, 1000, 1004, 1037.  She denied that she was afraid of petitioner, of CPL, or of
gang retaliation.  RT 1009, 1051-52.  She said that her house was particularly dark, RT 1035, and
that only the ceiling light in the kitchen and the bathroom light were on.  RT 1019, 1035.  Reinthaler
also said that she was so intoxicated that she could not identify the three men who charged into her
house.  RT 1036.  She did say that the person who pushed her had a small dark gun.  RT 990-91.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

6

1   repeatedly told Lopez, "Break yourself." Lopez did not know what he meant. RT 572-74, 646-47;

2   *see* RT 993, 1002. At the time, a gun was pointed at Lopez. RT 572, 574-75; RT 997. Petitioner

3   then approached Lopez and ripped a silver chain off Lopez's chest. Lopez did not resist because the

4   gun was pointed at him, and he was afraid. RT 574-75.

5        At that point, petitioner and Siller approached Reinthaler, who was still in the kitchen.

6   RT 575-76, 644. As Lopez started to get up from the couch, Herrera, who was still standing by the

7   door, reached for something under his sweater with one hand. RT 576-77, 644-45. Although Lopez

8   did not see any weapon on Herrera, Lopez thought that he could have something under his sweater

9   that he might use to harm Lopez. RT 644-45. Herrera told Lopez, "Break yourself." RT 576, 646;

10  RT 993, 1002. This time, Lopez understood what he meant. RT 647. Lopez handed Herrera

11  whatever money he had in his pocket and some identification cards. RT 576-78. When Lopez

12  protested that he needed his California I.D., Herrera gave it back to Lopez. RT 579, 640.

13       During the course of the robbery, petitioner ripped the phone out of the living room wall.

14  RT 586-587. After that, the three men left. RT 581. The entire incident lasted only a matter of

15  minutes. RT 651, 664.

16       About a minute or two after the incident, Lopez picked Reinthaler up from the floor. RT

17  665. They left the house and visited someone who lived just around the corner. They went there

18  to use the phone. RT 665, 1010.

19       After making a call, Lopez went his own way, and Reinthaler went back to her house. She

20  had been gone only five or ten minutes. RT 1013.

21       At trial, Reinthaler explained that she did not call the police that night because sometimes

22  they "are more hassle than [they] are worth." She denied that she refrained from calling the police

23  due to fear of gang retaliation. RT 1011. At trial, she also denied that she was trying to cover for

24  petitioner. RT 1015.

25       When Reinthaler's mother, Courtney Craig, received a call from a hysterical Reinthaler,

26  Ms. Craig came to San Jose that night to pick up her daughter. When Craig arrived at her daughter's

27  residence, she saw the damage in the house. RT 1070-73. The intruders had damaged the doorway

28  into the bathroom, RT 587-88, 1072; RT 665-66, and had knocked one of the sliding glass shower

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1    doors off its runner.  RT 588, 1072-73.

2         Reinthaler told her mother that someone had pointed a gun at her face.  She wanted to get

3    out of there.  She did not feel safe, and she was afraid that the intruders would come back.  RT 1074-

4    75, 1163.

5         Guray was there at the time.  She was still hysterical.  RT 1075.  She was disheveled, very

6    anxious, and fearful.  She kept looking over her shoulder.  When cars would pass by, she would look

7    out the window, toward the driveway.  She was visibly upset, and she spoke in "barrages."  Craig

8    said she seemed like a person who had just experienced something very traumatic.  RT 1076, 1104,

9    1107-08.[9/]

10        Reinthaler did not tell her mother who it was that she feared, but Guray did.  RT 1075.

11   When Craig asked Guray what had happened, she said something to the effect that Jesse was going

12   to come back.[10/]

13        Reinthaler went with her mother to her mother's house in Gilroy.  RT 1013.  When

14   Reinthaler left, she locked up the house on East St. James.  RT 1013, 1071.  Guray remained there,

15   sitting on top of her car.  She had no car keys, but she wanted to stay there in case someone came

16   to steal her car.  RT 1011, 1013-14.

17        On the way to Gilroy, Craig asked her daughter, "Now that this has happened, if they find

18   your body in a ditch somewhere, tell me who do we look for?  Who is it?"  Reinthaler told her

19   mother to tell the police, "It's Jesse Boy, and he's at Capital Park."  She said the police would know

20   who it is because there's only one in San Jose, but "[m]ake sure you say Capital Park."  RT 1077.

21        On surrebuttal, Reinthaler testified that she did not remember her mother asking her that,

22   RT 1164, and she said she never told her mother that she was afraid that petitioner would kill her.

23   _____

24        9.  On surrebuttal, Reinthaler testified that Guray had been using methamphetamines around
     the time of the robbery, and that on December 25, 2002, she looked like she was on
25   methamphetamines.  Reinthaler also testified that Guray would shoplift whenever she needed
     something.  RT 1150-52.
26

27        10.  In a conversation between Reinthaler and Guray which Craig overheard, Reinthaler said,
     in regard to the robbery incident, that "Jesse" was out of control, slightly psychotic, and was
28   "gacked out."  Guray agreed.  RT 1084, 1107.

     *Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
     PJH (PR)

1  RT 1154.  She suggested that her mother was mixed up.  Reinthaler testified that beginning in late

2  January of 2003, RT 1162-63, she had a very intimidating boyfriend named Julio Valdez who

3  frightened her.  He had been convicted of murder and had threatened Reinthaler.  RT 1152.

4  Although Reinthaler was not dating Julio when Craig allegedly asked Reinthaler on December 25,

5  2002, what to tell the police if something were to happen to Reinthaler, she said she did tell her

6  mother at some point that she feared that *Julio* might kill her.  RT 1154-55, 1164.

7          About two months after the Christmas Eve robbery, someone burglarized Reinthaler's

8  residence on East St. James Street, took some money, and trashed the house.  RT 1102.  Later, there

9  was another break-in at Reinthaler's residence.  Again money was taken, and the house was

10  ransacked.  RT 1102-03.  On surrebuttal, Reinthaler suggested that the break-ins were not

11  retaliatiory.  She testified that she and her boyfriend Julio had gotten into a fight, and he was the

12  person who trashed the house.  RT 1152.

13          By the time of trial, Reinthaler had moved back in with Craig permanently.  According

14  to Craig, her daughter moved there because she did not feel safe and wanted to get away from the

15  gangs.  RT 1080-81.

16  **B. Officer Hicks' Testimony Regarding Guray's Out-of-Court Statement**

17          Officer Hicks testified that on Christmas Eve, and going over to the morning of Christmas

18  Day, 2002, he was on patrol.  At about 1:00 a.m., he was in uniform, sitting in a marked police

19  vehicle in a residential area, one house away from the residence located at 736 East St. James.

20  While he was sitting there, Guray walked toward Officer Hick's passenger's side window.  RT 783-

21  85, 797.  Considering that here was a lone woman out at 1:46 a.m. on a Christmas morning, Officer

22  Hicks's first impression was that something bad had happened to her.  RT 800, 803-04.

23          Guray knocked on the window of the police car.  RT 798.  Although Guray did not seem

24  frantic, nor had she been trying to flag down the officer, RT 798, when Officer Hicks made eye

25  contact with her, she appeared "frightful" and "visibly upset."  Her eyes were red and puffy, as if

26  she had been crying.  RT 784-85.  Considering further how Guray looked when she approached the

27  officer, and based on her demeanor and attitude, Officer Hicks remained convinced that something

28  bad must have happened to Guray.  Talking to her did not dispel Officer Hick's assessment.  RT

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

9

1  804.

2      Guray told Officer Hicks that she had spent the evening her friends, Reinthaler and a male

3  named Sal (whose last name Guray did not know).  She said they spent the evening at 736 East St.

4  James Street, where Reinthaler lived.  RT 785-86.  Guray told Officer Hicks that there had been a

5  knock at the door.  As soon as Reinthaler went to answer the door, three males burst into the

6  apartment and robbed them.  RT 786-87;  RT 798.  Guray told Officer Hicks that the incident

7  occurred about 11:00 p.m.  RT 806-07.

8      Guray told Officer Hicks that she saw all three of the men come in, and she said she knew

9  all three of them.  RT 787.  She said that she had known all of them for about a week, and they were

10  members of a Capital Park street gang.  RT 790-91.  She identified them to Officer Hicks as Cootie,

11  Travieso, and Jessie.  RT 787.  She said Cootie had a silver chrome semi-automatic pistol, which

12  he pointed at Sal.  Guray told Officer Hicks that, at that point, she ran to the bathroom and locked

13  the door.  RT 788.

14      Guray told Officer Hicks that the intruder named Jesse then kicked the bathroom door, and

15  either the doorjamb or the lock broke.  RT 788-89;  RT 795.  The door opened and Jesse grabbed

16  her.  RT 788-89.  He pushed Guray to the floor[11] and said, "Give me your fucking purse and car

17  keys."  RT 789.  Her purse and car keys were on the floor of the hallway just outside the bathroom.

18  Guray said she gave Jessie the purse and car keys because she was very fearful that Jessie was going

19  to kill or harm her.  RT 789-90.  Guray described the purse as red with bandanna patterns.  RT 801.

20  In the purse were 30 dollars in cash, Guray's checkbook, her ATM card, her California ID card, and

21  her ring of car keys.  RT 791.

22      Guray told Officer Hicks that Jessie threatened her, saying that if she called the police, he

23  would kill her.  *Id.*  Guray told Officer Hicks that, after the incident, she noted that the telephone had

24  been disconnected from the wall.  RT 790.

25      Guray described the three robbers to Officer Hicks.  She said Jessie was 5'7", 140 lbs., and

26

27  ───────────────────────────────

28      11.  Apparently, the sliding glass door to the bathroom shower was knocked off its hinges
when petitioner pushed Guray.  RT 795.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

10

1  light complected, and she said he was wearing a black beanie and a black shirt.  RT 801-02.  She

2  also said he had green eyes.  RT 805.[12]  Additionally, Guray told Officer Hicks that the individual

3  whom she called Travieso lived on Park Avenue in San Jose.  RT 791-92.[13]

4         Guray told Officer Hicks that just prior to her making contact with Officer Hicks, she was

5  keeping an eye on her car, which was parked in the driveway of Reinthaler's residence at 736 East

6  St. James.  She was watching the car because her car keys had been stolen, and she was afraid that

7  the culprits would return to steal her car.  Officer Hicks went to the residence at 736 East St. James.

8  He saw a white 1985 Cadillac Biarritz parked there.  Guray stated that that was her car.  RT 792-93.

9         Officer Hicks spent an hour or more with Guray that evening.  RT 800.  It appeared to

10  Officer Hicks that she had been drinking.  *Id*.  Guray told him that she and her friends had been to

11  a club earlier, but she did not appear to be drunk.  RT 802-03.  She had no trouble walking, talking,

12  thinking, or speaking logically.  RT 803.  Officer Hicks, who had had training and experience in

13  determining whether people are under the influence of drugs, testified that Guray did not appear to

14  be under the influence of drugs.  *Id*.

15         Officer Hicks testified that he went over the information that Guray was giving him about

16  three times to make sure her facts were straight.  There were no significant differences in what she

17  told Officer Hicks each of those three times that she related what had happened.  RT 804.

18  **C.  The Investigation**

19         Lopez testified that during a brief period after the incident, the three victims remained

20  at the house.  They were traumatized by what had happened.  RT 653.  He said that he did not know

21  the three intruders before the night of the robbery.  RT 652-53.  When he, Reinthaler, and Guray

22  were talking after the incident about what had just happened, he Lopez overheard one of the women

23  say that the name of one of the intruders was "Jesse."  RT 653, 815, 817.

24         About a week after the incident, San Jose Police Sergeant John Tepoorten asked Lopez

25

26  _____

     12.  Petitioner's eyes are green or hazel.  RT 805-06.

27

28     13.  Later, Officer Hicks had another officer take Guray to the place where she said Travieso
       lived.  RT 792.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

11

to see if he could identify the suspects from some photo lineups, but Lopez refused because he was afraid of gang retaliation.  RT 589-90, 813;  RT 596, 600, 643, 657, 661-63, 813.[14/]  He was also afraid for the safety of his family.  RT 663.  Lopez told San Jose Police Officer Mike Nascimento, who was also present at the interview, that his brother had been involved in a gang-related incident and was being hunted down by  gang members.  Lopez said he did not want the same thing to happen to him.  RT 812-13.

        Despite his early reluctance to become involved, Lopez eventually identified the three suspects at the preliminary examination in April of 2003, and he was positive of his identifications at both the preliminary examination and at trial.  RT 590-91, 657-58.

        On January 2, 2003, Sergeant Tepoorten met with Guray.  She said that Jesse had robbed her.  Sergeant Tepoorten showed her a photo lineup, and Guray identified a picture of petitioner as the person who robbed her.  RT 822-25, 827, 853, 855; People's Exh. 17.

        When Reinthaler spoke with the police after the incident,  she told them that Jesse was the first intruder to rush into the house.  She said petitioner accused Guray of having set him up.  RT 1001.  She also said that Jesse held a gun to her chest and then pushed her into the kitchen.  RT 1000-01, 1004, 1005.[15/]

        When Sergeant Tepoorten showed Reinthaler a photo lineup, she selected petitioner's picture, but she testified at trial that she did not identify him as one of the perpetrators, but rather, in response to police questioning about whether she could identify Jesse, she selected his picture.  RT 1007, 1020-21, 1157.  She also selected a picture of Siller from a photo spread.  RT 1008.  Reinthaler had told Sergeant Tepoorten that Cootie put a gun to Lopez's face.  RT 1006.  When asked by Sergeant Tepoorten if she could identify Cootie from a photo lineup, Reinthaler said she

        14.  Lopez testified that, after the incident, petitioner's cousin's girlfriend contacted him.  RT 600, 661.

        15.  This was contrary to Reinthaler's trial testimony that she did not know who had pushed her to the floor in the kitchen.  RT 1000.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

12

1    selected two pictures which she believed looked like him.  RT 1008-09.[16/]

2         At trial, Reinthaler testified that she had seen petitioner on a couple occasions since the

3    incident.  RT 1011.  She denied that petitioner ever gave her a hundred dollars after the robbery, but

4    she admitted that, at one point, she told Sergeant Tepoorten that petitioner had given her a hundred

5    dollars.  She said that the reason she lied to Sergeant Tepoorten was to make him think that

6    everything had been rectified and was settled.  RT 1012.

7         Reinthaler testified that she obtained a police report from Siller's mother and became very

8    angry when she read it because, she said, it was inaccurate.  RT 1033-34, 1038, 1155; RT 1053.

9    She said that most of the information she had given to the police was information she had received

10   from Guray.  Reinthaler thought that the information might be wrong, and she did not want to get

11   in trouble for something that might be untrue.  RT 1167-68.  She called Detective Nascimento and

12   told him that she wanted to contact petitioner's defense counsel to let them know the reports were

13   wrong.  RT 1155.  Detective Nascimento refused to provide any means for Reinthaler to get in touch

14   with petitioner's attorney.  RT 1156.

15        At trial, Reinthaler acknowledged that she had told the police that the three perpetrators

16   were Cootie, Travieso, and Jesse Boy, but she also testified that Guray had given that information

17   to her.  RT 1038-41, 1165.  At first, Reinthaler testified that she did not tell the police that she had

18   only received the names of the perpetrators from Guray.  RT 1041.  Later, she testified that she

19   thought she eventually did tell the police that.  RT 1165-66.

20        Detective Nascimento testified about his contacts with Reinthaler.  He said that he spoke

21   with her first on December 27, 2002, and she was reluctant to cooperate.  She said she did not want

22   her name to appear in any reports because she was afraid of Jesse and his two friends.  RT 1109-10.

23   She said they belonged to the Capital Park gang.  Detective Nascimento asked if petitioner had been

24   one of the gunmen, and Reinthaler said yes, he was the one who pushed her into the kitchen at

25   _____

26        16.  Reinthaler had met Siller about twice before the home invasion, and she knew that he
     went by a nickname like Travieso.  RT 999.  She said she believed he was a member of CPL.  RT
27   1052.  She said she did not know Gabriel Herrera (Cootie) before this incident.  RT 999, 1005, 1008-
     09, 1053.

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1  gunpoint.  RT 1110-11.  She told the detective that she had partied with all three of the intruders

2  before.  RT 1111.

3       Detective Nascimento testified that he was present on December 31, 2002, when Sergeant

4  Tepoorten interviewed Reinthaler.  On that occasion, she asked Detective Nascimento if he was tape

5  recording her.  He said no.  Neither officer told her that Sergeant Tepoorten was tape recording the

6  interview.  RT 1111.  Reinthaler told the officers that she did not want to be involved and did not

7  want her name in any police reports.  When Sergeant Tepoorten asked if she could identify certain

8  individuals in some photo displays, Reinthaler selected some photos, but she would not circle the

9  pictures she had selected.  She seemed afraid, so Detective Nascimento circled the photos that she

10  had selected.  RT 1111-12; RT 1143.

11       Sergeant Tepoorten, testifying about that same interview, said that Reinthaler picked

12  petitioner's photo out of a photo spread as being one of the suspects involved in this case.  RT 1143.

13  She identified him as the individual who had forced his way into the residence.  RT 1146.  She also

14  selected Siller's photo from a separate photo spread, and she picked two photos from a third photo

15  spread.  One of the two pictures she selected from that display was a picture of Gabriel Herrera.  RT

16  1143-45.  Reinthaler was extremely reluctant to cooperate when the police conducted this second

17  interview with her.  RT 1145-46.

18       On December 31, 2002, Sergeant Tepoorten and Detective Nascimento conducted a search

19  of Siller's residence at 1087 Park Avenue in San Jose.  RT 825-26, 862-63.  In a bedroom, the

20  officers found petitioner's kindergarten I.D., People's Exh. 2; RT 579, Guray's picture I.D., People's

21  Exh. 3; RT 580, a California Benefits I.D. card for Guray which was inside a billfold, People's Exh.

22  25; RT 857, 862-63, and Guray's medical marijuana I.D.  RT 862-63.

23       Also found at Siller's residence was a large amount of gang indicia.  RT 853-70.  The

24  names CPL, RT 855, 857, Capital Park Locos, RT 856, Travieso, RT 856-58, 868, Cootie, RT 857,

25  868, Norteno, RT 857, and XIV, RT 857, appeared on various items.  Also seized were a number

26  of photographs.  They included photos of Herrera.  RT 860.  One photograph depicted Herrera and

27  Siller together throwing hand signs.  RT 861.  In only two pictures did Sergeant Tepoorten think that

28  the individuals depicted could be petitioner, but he could not say for sure.  RT 865-67.  None of the

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

14

1   indicia seized had any writing on it that made reference to petitioner.  RT 868-69.

2         At trial, Officer Nascimento testified that, in connection with a prior incident in 1997,

3   petitioner admitted to Officer Nascimento that he had been a member of the Capital Park Locos

4   (CPL) gang since 1994.  RT 810-12.  At that time, Officer Nascimento performed a search of

5   petitioner's bedroom and found indicia that petitioner was in a gang.  RT 812.  As far as Officer

6   Nascimento knew, petitioner was still a CPL member at the time of trial.  RT 818.

7   **D.  The Alibi Witnesses**

8         Petitioner's cousin Alma Barrigan, RT 884, his aunt Lisa Barrigan, RT 907, his "very

9   close" cousin Miguel Torres, RT 925-26), his aunt Juanita Garcia, RT 933, his sister Olga Zuniga

10  Henriquez, RT 946, and his cousin Jena Torres, RT 975, all testified that, on Christmas Eve of 2002,

11  petitioner was at his grandmother's house for a party where family members opened their Christmas

12  presents at around midnight.  RT 882, 884, 907, 918, 922, 933-34, 975-78.

13        The prosecutor elicited from almost every one of the alibi witnesses testimony that they

14  had not talked to anyone about testifying for petitioner until an investigator working for petitioner's

15  attorney asked them, for the first time, to testify, and that the investigator only asked them to do so

16  the very week before the witnesses actually came to court to give their alibi testimony.  RT 900-04,

17  915-17, 929-31, 959, 961-64;  *see* RT 944, 978-79.

18        Alma Barrigan testified that petitioner arrived at the party about 9:30 or 10:00 p.m.  RT

19  884, 898.  She said she left sometime after 1:30 a.m., and she thought that petitioner was still there.

20  RT 884.  She testified that she saw petitioner opening gifts after midnight.  She never saw petitioner

21  leave the party.  RT 885.  The house was big and crowded, with perhaps 40 to 50 people in

22  attendance.  RT 883, 890-91, 896.  Petitioner was not in her sight the whole time.  RT 899.

23        Lisa Barrigan testified that petitioner arrived at the party about 10:00 p.m., or perhaps as

24  late as 11:00 p.m.  RT 907, 919.  Although she was not watching petitioner throughout the evening,

25  she did not see him leave during the party.  RT 908.

26        Miguel Torres testified that he first saw petitioner at the party between 7:30 and 8:00 p.m.

27  RT 923.  He did not see petitioner leave during the party.  RT 923-24.  He saw petitioner opening

28  presents around midnight.  RT 924.  Petitioner left sometime after the presents were opened.  RT

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

15

922.  Mr. Torres said that he was not keeping tabs on everyone at the party.  RT 926.

Juanita Garcia testified that there were about 22 people at the party, plus some others perhaps who came and went.  RT 933.  She saw petitioner arrive close to 10:00 p..m.  RT 934.  Ms. Garcia said they started opening presents some time between 11:30 p.m. and midnight, and petitioner left after midnight, after the presents were opened.  RT 934-35.  In the interim, she did not see petitioner leave the party.  RT 935.  However, she did not pay attention to petitioner that entire evening.  RT 938.  If someone had gone to run an errand, Ms. Garcia might not have noticed.  RT 940.  She noted that people could get drinks from an ice chest that was outside of the house, and some children and a few adults were playing outside.  RT 941-42.  Someone could have taken off for 15 or 20 minutes, and Ms. Garcia might never have known.[17/]  She was not following petitioner around all night watching what he was doing.  RT 942.

Petitioner's sister, Olga Zuniga Henriquez, testified that petitioner arrived at the party about 10:30 p.m., and he left at 12:45 or 12:50 a.m.  She did not see petitioner leave at any time before then.  RT 946-47, 967, 969.

Olga said that when petitioner arrived at the party, she went outside and looked at the car petitioner was driving to see if anything was wrong with it.  None of the windows had been shot out or broken.  RT 957.

Olga testified that she kept looking at the clock that night because she had her cell phone on.  RT 950, 969, 973.  When the prosecutor asked Olga if she had her cell phone records for Christmas Eve, she said she had thrown those records away.  RT 958-59.

Olga did not see anybody go outside to the ice chest to get alcohol.  RT 952.  She said she was not always watching the front door, but she could hear it open and close.  RT 953.  She said she paid attention to people who were going in and out.  RT 954.  She went into labor that night.  Her water broke, but she did not go to the doctor until the next morning.  RT 954-55.  Nevertheless, she

---

17. Defense investigator Bruce Rak drove from petitioner's grandmother's house to 736 East St. James Street by driving on city streets.  The distance was 6.6 miles, and driving at the speed limit and obeying all traffic laws, it took him 29 minutes to make the round trip.  RT 1170-72.  He did not know if he could reduce the time by driving on the freeway.  RT 1171.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

16

1    was watching people, and she would have seen anyone who went outside.  However, she said she

2    did not see anyone go out.  RT 956.  In particular, she did not see petitioner go outside, and she said

3    she knew what petitioner was doing at all times during the party.  RT 965-66.  He was there the

4    whole time.  RT 970-72.

5    　　　　Olga testified that after the Christmas party, when petitioner was first charged, she spoke

6    with her mother and learned that petitioner was in custody for something that had happened on

7    Christmas Eve.  Olga further testified that even though she knew petitioner had been at their

8    grandmother's house that night for a Christmas party, Olga did not contact the police or the district

9    attorney with that information, and nobody–not even petitioner–contacted her about testifying until

10   the defense investigator contacted her the week before she testified.  RT 961-64.

11   　　　　Jena Torres testified that she did not know when petitioner arrived at the party, but he was

12   there at midnight, when they opened the presents.  RT 977.

13   　　　　The prosecution called petitioner's aunt, Sandy Zuniga, as a witness in rebuttal to the alibi

14   witnesses.  She said she saw petitioner at the Christmas party.  The prosecutor asked her if she had

15   told District Attorney's Investigator Jorge Perez something different–that she had not seen petitioner

16   at the party.  Sandy Zuniga denied that she said that to the investigator.  She testified that she

17   petitioner was there.  RT 1114-15.

18   　　　　She also said that until Investigator Perez talked to her just a few days before her trial

19   appearance, no one had talked to her about whether petitioner was at the Christmas party.  RT 1115-

20   16.  When asked whether she had heard Olga Zuniga tell family members at the Christmas party that

21   petitioner had called her and said that he had been in some trouble and had been jumped, Sandy

22   Zuniga said she could not recall.  When asked if she told Investigator Perez that Olga Zuniga had

23   said something to that effect, again Sandy Zuniga said she did not remember.  RT 1117.

24   　　　　The People then called Investigator Perez, who testified that he had spoken to Sandy

25   Zuniga over the telephone on July 10, 2003, RT 1118-21, and she told him that she said she did not

26   think petitioner was at the Christmas party.  RT 1122.  She also told Investigator Perez that at about

27   10:00 p.m., Olga Zuniga received a phone call from petitioner indicating that he had been in some

28   trouble and had been jumped.  RT 1123.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

17

1   Petitioner's cousin, Alma Barrigan, RT 884, testified that she saw Sandy Zuniga at the

2   party, and she was intoxicated.  RT 1065.  Petitioner's sister, Olga Zuniga Henriquez, RT 946,

3   testified that Sandy Zuniga is petitioner's aunt by marriage.  Olga testified that it is hard to tell when

4   Sandy Zuniga is intoxicated because she has been drinking almost all her life, but at the Christmas

5   party, she was acting drunk, and her speech was slurred.  RT 1056-58.

6   **E.  The Bifurcated Trial Of The Gang Enhancement**

7   At the bifurcated trial of the gang enhancement, RT 1279-1370, San Jose Detective

8   Gregory Lombardo, who had already been accepted as an expert in the area of San Jose street gangs,

9   RT 828-30, testified that CPL was an active criminal street gang with a common name and

10  identifying signs or symbols and about 40 to 50 members.  RT 1286, 1295-96, 1316, 1332.  He said

11  that its primary activities included assaults with deadly weapons, robbery, attempted murder, and

12  threats to commit crimes that would result in great bodily injury or death.  RT 1286, 1316, 1332.

13  The prosecutor introduced People's Exhibits 37 and 38, which recorded that co-defendants

14  Siller and Herrera had been convicted of the two robberies charged in this case, based upon their

15  guilty pleas.   The same documents also recorded Siller and Herrera's admissions of gang

16  enhancements in connection with the robberies.  RT 1297-98; CTA 66-69; People's Exhs. 37 and

17  38.  Detective Lombardo also testified that Siller and Herrera were members of CPL.  RT 1304-07.

18  These minute orders and the opinion of Detective Lombardo, based upon other criminal history

19  information, supplied proof that CPL members individually or collectively engaged in a pattern of

20  criminal gang activity, including two attempted murders and an assault with a deadly weapon.  RT

21  1286-92, 1296; CTA 1-56; People's Exhs. 33-35.

22  Based upon Detective Lombardo's review of the current case, petitioner's prior contacts

23  with the police department, based upon his observation of petitioner's tattoos, and based upon court

24  records memorializing petitioner's prior conviction for possession of a sawed-off shotgun and

25  admission of a gang enhancement, CTA 57-65; People's Exh. 36, Detective Lombardo opined that

26  petitioner was a CPL member.  RT 1298-1304.  In response to the prosecutor's hypothetical

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1  questioning based upon the facts of the current case,[18] Detective Lombardo stated his opinion that

2  the current offenses were committed for the benefit of CPL.  RT 1308-13.

3       The detective also testified that criminal street gangs attempt to terrorize, intimidate, and

4  exercise control over innocent people and witnesses in order to enhance the gang's power and

5  reputation.  RT 1310-13.

6

7                                    **ARGUMENT**

8                                         **I.**

9  **THE INTRODUCTION OF OFFICER HICKS'S TESTIMONY ABOUT
   WHAT GURAY TOLD HIM IS NOT A GROUND FOR ISSUANCE OF
10 THE WRIT OF HABEAS CORPUS**

11 **A.  Introduction**

12      Petitioner argues that Guray's description of the attack to Officer Hicks was not an

13 "ongoing emergency" within the meaning of *Davis v. Washington*, 547 U.S. 813 (2006), Ptn.,

14 Memo. of P.'s and A.'s at 11,  and therefore, her statement to the officer was "testimonial."  *Id*.

15 Since Guray was unavailable at trial for petitioner to cross-examine her,[19] the introduction of

16 Guray's pretrial statement through the testimony of Officer Hicks before the jury violated *Crawford*

17 *v. Washington*, 541 U.S. 36 (2004), *id*., and infringed upon petitioner's Sixth Amendment right to

18 confrontation and cross-examination.  Ptn., Memo. of P.'s and A.'s at 11-19.

19      In response, respondent contends that the California Court of Appeal's determination that

20 "some of Guray's statements–for example, that her car keys had been stolen when three persons she

21 knew as Cootie, Travieso and Jesse came into an apartment nearby and robbed her and her two

22 friends–must be considered non-testimonial,"  Exh. Z at 14, was not contrary to, or involved an

23 unreasonable application of, clearly established Federal law, as determined by the Supreme Court

24 of the United States.  28 U.S.C. § 2254(d)(1).  Second, respondent contends that, in light of the

25 _____

26      18.  The hypothetical question included a fact derived from the evidence at the first portion
   of the bifurcated trial which had shown that petitioner announced that he was from CPL when he
27 first broke into Reinthaler's residence.  RT 564.

28      19.  Guray did not testify at petitioner's preliminary examination.  See CT 1-2.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

record as a whole, the trial court's decision to admit Guray's entire statement through the testimony of Officer Hicks had no "substantial and injurious effect of influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993); *see Fry v. Pliler*, 551 U.S. ___, 127 S.Ct.2321, 2328 (2007) (in a proceeding under section 2254, a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht*, 507 U.S. at 637-638, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "'harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also* Exh. Z at 15 (California Court of Appeal holding that the introduction of Guray's statement was harmless beyond a reasonable doubt under *Chapman*, 386 U.S. 18).

**B.    The Record Which Was Before The Trial Court At The Time It Decided To Admit Officer Hicks's Testimony About What Guray Told Him**

At trial, the prosecutor sought an in limine ruling that Guray's pretrial statements to Officer Hicks would be admissible under the California exceptions to the hearsay rule for statements describing the infliction or threat of physical injury, Cal. Evid. Code § 1370, and for spontaneous statements, Cal. Evid. Code § 1240.   CT 207-08; RT 673-91.[20]   The court found Guray to be unavailable, RT 691; *see* CT 208, and then, Officer Hicks testified in support of the admissibility of Guray's pretrial statements.  CT 208; RT 692-702.

Before the trial court ruled that Guray's pretrial statement to Officer Hicks would be admitted, Officer Hicks gave foundational testimony to support the admissibility of Guray's statement.  He testified that most recently he had been a San Jose police officer for eight years, and before that, he was a deputy sheriff for 12 years.  RT 696.

Officer Hicks testified that he was on duty on the night of Christmas Eve, going over into Christmas morning of 2002.  At about 1:46 a.m., he was sitting in his police car in a residential

---

20.  Petitioner did not object to the introduction of Guray's pretrial statements on the ground of the Sixth Amendment rights of confrontation and cross-examination, RT 703-10, 782-789, and the trial court made no mention of these Sixth Amendment rights when ruling on the admissibility of Guray's pretrial statements through Officer Hicks's testimony.  RT 710.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

20

1  neighborhood, just down the street from 736 East St. James. Guray walked up to the window on the

2  passenger side of his police car. She knocked on the window and asked to speak to Officer Hicks.

3  Officer Hicks rolled down the window. RT 693-94.

4  When Officer Hicks first saw Guray, she looked "worried, fearful," and "hesitant." RT

5  694; *see also* RT 695, 701-02. Officer Hicks's first thought was that she was a crime victim. *Id*.

6  She looked as if she had been crying. Her eyes were "kind of droopy," and there were circles under

7  her eyes. She was visibly upset. RT 701.

8  Considering her appearance, and her apparent fearfulness and reluctance to talk to Officer

9  Hicks, and furthermore, in light of Officer Hicks's many years of experience in dealing with crime

10  victims, it seemed obvious to him that Guray might be a crime victim. RT 701-02. At trial, Officer

11  Hicks conceded, however, that he could have been mistaken. He acknowledged that Guray's

12  appearance was also consistent with someone who had just gotten into an argument with their

13  boyfriend. RT 702.

14  Officer Hicks evaluated whether Guray was under the influence of alcohol. He

15  determined that she had been drinking. He noted no indication of methamphetamine or marijuana

16  use. RT 700-01.

17  Guray told Officer Hicks about an incident that had occurred earlier that evening at 736

18  East St. James. As she talked, she seemed upset or anxious. RT 695. Officer Hicks did not notice

19  anything in his conversation with Guray that raised any possibility that she might be making up the

20  events that she was describing. RT 696. She said that someone had robbed her. RT 698.

21  Guray said that three people had barged into the residence. RT 696. She said that when

22  the men entered, she saw that one of them had a pistol. RT 698. She retreated to the bathroom to

23  get away from the intruders, and she locked the bathroom door. RT 695-96, 698. One of the men,

24  whom she identified by his first name, Jesse, kicked the bathroom door, splintering the lock. Guray

25  told Officer Hicks that Jesse then told her to get on the floor. Next, he demanded her purse and her

26  keys. RT 698. After threatening to kill her if she did not give him her property, Jesse took her

27  purse, her keys, and her cell phone. Guray also reported to Officer Hicks that Jesse threatened to

28  kill her if she called the police. RT 699.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

21

1    Guray explained that she waited a couple hours before talking to Officer Hicks because

2    one of the three intruders had taken her car keys, along with other property, and her vehicle was still

3    parked in the driveway in front of the residence.  Fearing that her car would be stolen, Guray said

4    she remained there to keep an eye on her car.  RT 697.

5    Guray took Officer Hicks to the residence where she said the incident occurred.  There,

6    Officer Hicks observed that the doorjamb to the bathroom had been splintered where the lock met

7    the wall.  RT 695-96.  He also noted that a telephone line had been ripped out of the wall.  RT 696-

8    97.

9    Guray told Officer Hicks that she knew where one of the intruders, whom she identified

10   as Travesio, lived.  Officer Hicks had another officer take Guray to locate that individual's

11   residence.  RT 699.

12   On cross-examination, Officer Hicks testified that Guray could have gone to another

13   residence in the neighborhood to report the crime.  Officer Hicks said that as Guray was describing

14   what had happened, Officer Hicks was taking some notes regarding certain details in Guray's

15   statement, but Officer Hicks said that, generally, he just took Guray's story "verbally."  Within an

16   hour after Guray had contacted Officer Hicks, the officer wrote a report.  RT 700.

17   Officer Hicks testified that he went over Guray's story quite a few times.  He said that he

18   usually goes over witnesses' statements three times, and if, after the third time, their story is

19   consistent with their initial report, Officer Hicks will take the witness's word, especially if there is

20   observable evidence that corroborates the witness's story.  According to Officer Hicks, Guray's

21   story did not deviate from her original report, and there was other evidence which corroborated what

22   she told him.  RT 702.

23   After Officer Hicks was done testifying, the trial court ruled that Guray's pretrial

24   statements to Officer Hicks would be admissible under both hearsay exceptions for statements

25   describing the infliction or threat of physical injury, Cal. Evid. Code § 1370, and spontaneous

26

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1  statements, Cal.Evid. Code § 1240.  CT 208; RT 710.[21/]  The next day, Officer Hicks testified before

2  the jury, without objection, as to what Guray had told him.  RT 783-890.

3

4  **C.  The California Court Of Appeal's Determination Of The *Crawford* Issue**

5       Between the time of petitioner's sentencing on March 4, 2004, CT 453-54, and the filing

6  of petitioner's opening brief on direct appeal on October 19, 2004, Exh. R, the United States

7  Supreme Court, on March 8, 2004, decided *Crawford*, 541 U.S. 36.  In petitioner's opening brief on

8  appeal, he cited *Crawford* and argued that the introduction of Guray's statements to Officer Hicks

9  violated his Sixth Amendment right to confrontation because her statement was testimonial, and he

10  had not had an opportunity to cross-examine her.  Exh. R at 12-23; see Exh. T (respondent's brief)

11  at 25-34, 43-55; Exh. V (reply brief) at 1-14.  While petitioner's appeal was still pending, the United

12  States Supreme Court decided *Davis*, 547 U.S. 813, which illustrated the difference between

13  testimonial and non-testimonial out-of-court statements, and the California Court of Appeal

14  requested the parties to provide supplemental briefing in light of *Davis*, Exh. W, which both parties

15  provided.  Exhs. X, Y.

16       The Court of Appeal then issued its opinion.  It examined at length the holdings in

17  *Crawford* and *Davis* and applied them to the evidence in the instant case.  Exh. Z at 8-15.  First,

18  quoting pertinent portions of *Davis*, the Court of Appeal stated

19      Although the court [in *Davis*] expressly rejected the position that "virtually any 'initial inquiries' at the crime scene will not be testimonial," it also declined to "hold the

20  opposite–that *no* questions at the scene will yield nontestimonial answers.  We have already observed of domestic disputes that '[o]fficers called to investigate . . . need to

21  know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.'  [Citation.]  Such exigencies may

22  often mean that 'initial inquiries' produce nontestimonial statements.  But in cases [where] statements [are] neither a cry for help nor the provision of information enabling officers

23  immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial."  (*Davis*, *supra*, [547 U.S. at 832],

24  126 S.Ct. at p. 2279.)

25  Exh. Z at 13.

26

27

    21.  On appeal, the California Court of Appeal held that this evidence was admissible under

28  the spontaneous statement exception.  Exh. Z at 15-17.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

23

1          Following this distillation of the principles applicable to this case, the California Court

2   of Appeal then applied those principles, saying that in this case, it was

3          called upon to discern the point at which, for Sixth Amendment purposes, statements
           made in response to initial inquiries designed to resolve an ambiguous and potentially
4          dangerous situation evolve into full-blown testimonial statements made in response to
           structured interrogation undertaken for the purpose of investigating a crime. Viewing the
5          situation from an objective point of view, and taking into account the perspectives of both
           Guray and Officer Hicks, it is reasonable to infer that Guray approached Officer Hicks
6          with the idea of securing his assistance in resolving her predicament—that she was locked
           out of her car and feared the imminent return of the people who had stolen her keys—and
7          that Officer Hicks perceived that she was seeking assistance of some kind. *Thus, the only
           objectively reasonable inference to be drawn is that his initial inquiries were designed to
8          resolve whether there was some ongoing emergency; whether weapons or violence were
           involved; and if so, whether the perpetrator or perpetrators were still in the vicinity or at
9          large. Thus, at a minimum, some of Guray's statements—for example, that her car keys
           had been stolen when three persons she knew as Cootie, Travieso and Jesse came into an
10         apartment nearby and robbed her and her two friends—must be considered nontestimonial.*
           To resolve that, in fact, there was no ongoing emergency, Officer Hicks would have had
11         to learn these basic facts about Guray's immediate situation. However, as soon as Officer
           Hicks learned that these events had happened hours rather than minutes before Guray
12         contacted him, and he began to elicit details of the events, such as the color of the gun, or
           who entered first, Guray's statements became testimonial. Thus, we conclude that *the
13         balance of Guray's statements to Officer Hicks were inadmissible under Crawford and
           Davis.*
14
    Exh. Z at 14-15 (emphasis added).
15
           Thus, the state appellate court found that some portion of Guray's pretrial statement to
16
    Officer Hicks was nontestimonial, and therefore would not be excludable as violative of the Sixth
17
    Amendment right to confrontation.   However, the California Court of Appeal found that the
18
    introduction of Guray's entire statement was harmless beyond a reasonable doubt under *Chapman*,
19
    386 U.S. 18, as follows:
20
           However, our conclusion does not require reversal of defendant's conviction because we
21         are convinced that the admission of the entire statement was harmless beyond a reasonable
           doubt. (*Chapman v. California* (1967) 386 U.S. 18.) The evidence establishing the
22         essential elements of the robbery, assault and firearm use were supplied by those
           statements of Guray which were not excludable, in combination with Reinthaler's
23         testimony and prior inconsistent statements, Lopez's testimony and corroborative
           evidence gathered by police. Together this evidence established that defendant was one
24         of the three intruders, that he brandished a gun at Reinthaler, that Guray was inside the
           bathroom when he broke down the bathroom door, that Guray was screaming, and that her
25         car keys were stolen. Assault, robbery and firearm use were inferable from these facts,
           with or without Guray's entire statement. The *Crawford* error was harmless beyond a
26         reasonable doubt.

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

24

1    Exh. Z at 15.[22/]

2    **D.    The State Court's Determination That The Initial Portion Of Guray's Pretrial**
     **Statement Was Nontestimonial Was Neither Contrary To, Nor An Unreasonable**
3    **Application Of, *Crawford* Or *Davis*, 28 U.S.C. § 2254(d)(1), Nor Was It Based Upon**
     **An Unreasonable Determination Of The Facts In Light Of The Evidence, 28 U.S.C.**
4    **§ 2254(d)(2)**

5        **1.    The Nature Of The Inquiry**

6            First, petitioner argues that the state court's determination of his *Crawford* claim was

7    contrary to, or an unreasonable application of *Crawford* and *Davis*, 28 U.S.C. § 2254(d)(1), and that

8    it was based upon an unreasonable determination of the facts in light of the evidence of record in

9    the state court, 28 U.S.C. § 2254(d)(2).  Ptn., Memo. of P.'s and A.'s at 11-19.  His contention is

10   that, in determining whether a statement is testimonial, the court's focus is limited to an objective

11   examination of the nature of the statement itself.  Thus, he claims that if a statement describes past

12   events, then it is necessarily testimonial.  Consistent with this narrow approach, petitioner argues

13   that neither the purpose of an officer's interrogation of a witness or victim, nor the purpose of the

14   declarant in making a statement to the officer, is relevant to the legal determination of whether the

15   declarant's pretrial statement was testimonial.  *Id.* at 11-12.

16            Petitioner then adverts to particular passages in Officer Hicks's testimony where the

17   officer stated that Guray had told him about an incident which had taken place earlier that evening.

18   Ptn., Memo. of P.'s and A.'s at 14-15 (citing 6RT 695; 7RT 785-809).  Petitioner contends that such

19

20   _____

21       22.   In the conclusion of the California Court of Appeal's opinion on direct appeal, it
     reiterated

22          Guray's initial statements to Officer Hicks indicating that she and her friends had
23          been robbed of her car keys by defendant and two other people she knew, were not
            testimonial because they were elicited for the purpose of determining whether Guray
24          was in need of assistance for an ongoing emergency, and whether the perpetrators
            were still in the vicinity. However, the balance of her statements were testimonial
25          and therefore inadmissible under *Crawford*, because once Officer Hicks was able to
            determine from her statements that that was no immediate emergency, Guray's
26          statements were elicited for the purpose of investigation. However, the admission of
            the entire statement was harmless beyond a reasonable doubt.
27

28   Exh. Z at 24.
     *Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
     PJH (PR)

1    statements of past events cannot be considered to be testimonial.  Ptn., Memo. of P.'s and A.'s at

2    14-15.

3           He also argues that when Guray told Officer Hicks that the suspects had taken her keys

4    and her property, and that she was afraid that they might come back and steal her car, the evidence

5    was unclear as to when Guray disclosed that information–i.e., whether she disclosed it when she first

6    approached the officer, or later, after she took him back to her apartment–and in any event, the

7    taking of Guray's keys had occurred prior to her telling Officer Hicks that they had been taken, so

8    even her statements about her keys having been taken and about why she was watching her car were

9    testimonial.  Ptn., Memo. of P.'s and A.'s at 14-16.

10          Petitioner's approach to the determination of whether a pretrial statement was testimonial

11   is too restrictive, and it is clearly contrary to the holding of *Davis*.  Petitioner even quotes portions

12   of *Davis* which are contrary to his position.  For example, petitioner quotes a passage that clearly

13   contemplates looking beyond whether an event described in an out-of-court statement predated the

14   statement, as follows:

15          Statements are nontestimonial when made in the course of police interrogation under
       circumstances objectively indicating that *the primary purpose of the interrogation* is to

16     enable police assistance to meet an ongoing emergency.  They are testimonial when the
       circumstances objectively indicate that there is no such ongoing emergency, and that *the*

17     *primary purpose of the interrogation* is to establish or prove past events potentially
       relevant to later criminal prosecution.

18   Ptn., Memo. of P.'s and A.'s at 11 (quoting *Davis*, 547 U.S. at 822) (emphasis added).

19
           Under *Davis*, the focus is not merely upon the nature of the statement, or the timing of the

20   statement in relation to when the events occurred, but rather the focus is broader than that–it takes

21   into consideration what the "circumstances" objectively indicate about the "primary purpose of the

22   interrogation," and specifically, whether the primary purpose was "to enable police assistance to

23   meet an ongoing emergency," or alternatively, the primary purpose was "to establish or prove past

24   events potentially relevant to later criminal prosecution."   In our case, what then do the

25   circumstances objectively show to have been the primary purpose of the encounter between Guray

26   and Officer Hicks?  Answering this question entails an inquiry much broader than the one that

27   petitioner proposes.  That is the analysis which the state court undertook here, and it was not

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

26

1  contrary to, or an unreasonable application of, *Crawford* or *Davis*.

2  　　　In the present case, at least some of the information which Guray gave to Officer Hicks

3  was nontestimonial because, even though petitioner and his confederates had departed the crime

4  scene, at least some of that information was given under circumstances which objectively indicated

5  that the primary purpose was to enable the police to assist her in an ongoing emergency.

6  　　　The record clearly established that Guray approached Officer Hicks at 1:46 a.m. on

7  Christmas morning in a residential area–not a time or place where one would likely seek out a police

8  officer for the purpose of simply offering up a witness statement of past events with a view toward

9  later criminal prosecution.  In fact, the record, including Guray's persistent refusal to cooperate with

10  the prosecution, suggests that she gave no thought of preserving her statement to Officer Hicks for

11  the purpose of prosecution.  Viewed objectively, Guray's behavior, as a whole, does not appear to

12  have been directed simply toward memorializing a past event but rather to have been a cry for help.

13  　　　When Officer Hicks was called as a prosecution witness for the purpose of laying a

14  foundation for the admission of Guray's statement as an exception to the hearsay rule, he described

15  how Guray approached his police car.  Officer Hicks was a very experienced police officer, with

16  eight years in the San Jose Police Department and, before that, 12 years as a deputy sheriff.  RT 696.

17  He was parked just down the street from where the robberies and the assault had occurred.  At about

18  1:46 a.m. on Christmas morning, he was sitting in a parked patrol car in a residential area when a

19  lone woman, Guray, approached, knocked on the passenger side window, and asked if she could

20  speak with Officer Hicks.  RT 693-94.  Officer Hicks did not seek out Guray, nor was he responding

21  to a report of a disturbance.

22  　　　Officer Hicks described Guray's appearance as "worried, fearful," and "hesitant."  RT

23  694; *see also* RT 695, 701-02.  She looked like she had been crying, and her eyes were "kind of

24  droopy."  There were circles under her eyes, and she was visibly upset.  RT 701.  Officer Hicks's

25  experience led him to conclude that Guray was possibly a crime victim.  RT 701-02.  Although

26  Officer Hicks had not personally heard any crashes or screaming, and had not personally observed

27  any present physical altercation, nor any need for immediate medical assistance, Guray did seem

28  upset or anxious while she talked to Officer Hicks.  RT 695.  She appeared as if she had been

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

27

1    victimized, and her appearance genuinely suggested that her safety was presently in danger and that

2    steps were necessary to resolve the current exigency.  RT 694-95, 701-02.

3        The situation which Guray proceeded to describe was exigent and unresolved.  Three

4    people, one of whom was armed with a pistol, were still at large.  Within the past few hours, they

5    had robbed Guray of her purse, her cell phone, and her car keys.  Petitioner had threatened to kill

6    her if she called the police.  RT 699.  As if that threat, and the taking of her cell phone, *id.*, were not

7    enough to explain her delay in seeking police assistance,[23] Guray also explained to Officer Hicks

8    why she had stayed at the scene and had not sooner contacted the police:  the robbers had taken her

9    car keys, her car was still parked at the scene of the robbery, and she feared that the robbers would

10   return to steal her car.  This concern had not yet been resolved when Guray spoke to Officer Hicks.[24]

11    Further support for a finding that exigence was still present may be found in Officer's Hicks's

12   testimony that he had another officer take Guray to locate the residence of one of the intruders whom

13   she knew as Travesio.[25]

14       The record is unclear how much time elapsed between the robbery and Guray's contact

15   with Officer Hicks.  According to Officer Hicks's testimony at trial, Guray reported that the robbery

16

---

17       23.  The evidence showed that petitioner had also disabled the phone in the residence where

18   the robbery occurred by pulling the wire out of the wall.  RT 586-87, 697, 790.

19       24.  Reinthaler's mother, Courtney Craig, testified at trial that her daughter had characterized

20   petitioner as "out of control, slightly psychotic, and . . . 'gacked out' . . . ."  RT 1084.  Guray had
agreed that petitioner was "out of control."  RT 1107.  Craig also described Guray's appearance and

21   demeanor when Craig went to pick up Craig's daughter, Reinthaler.  Craig described Guray as
hysterical, RT 1075, disheveled, very anxious, and fearful.  RT 1076, 1107.  She kept looking

22   toward the driveway whenever cars would go by.  RT 1076, 1104.  She was speaking in "barrages,"
RT 1104-05, 1107, and it seemed like she had just undergone something very traumatic.  RT 1108.

23   She expressed fear that petitioner was going to come back.  RT 1105-06.  Craig's description of
Guray's appearance and demeanor between the time of the robbery and Guray's contact with Officer

24   Hicks supplies strong evidence that for a considerable time after the robbery, Guray was of the view
that there was still an ongoing emergency even after the three intruders had departed the scene.

25   Craig's removal of her daughter from the scene also supports the inference that the threat had not
yet dissipated.

26

27       25.  The record does not establish the reason why the police took Guray there, but,
inferentially, it could have been to find the gun, or to locate the at-large suspects, and thus reduce

28   the existing threat level.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

28

occurred at about 11:00 p.m.  RT 806-07.  At one point, Reinthaler testified at trial that the robbery occurred at about 11:00 p.m.  RT 1021.  At another point Reinthaler said it was "very late," "probably before" midnight.  RT 989.  Lopez testified that the intruders burst into the house a little before midnight.  RT 615.  Both at the in limine hearing which was prompted by petitioner's hearsay objection, RT 693, and again at trial, RT 800, Officer Hicks fixed the time when Guray contacted him at 1:46 a.m.  Despite this passage of time, the evidence showed that the exchange between Guray and Officer Hicks was not simply a recounting of past events, with a view toward their memorialization for the purpose of prosecution, but instead,  to meet an ongoing emergency.

The record does not suggest that Officer Hicks spent a great deal of time and energy memorializing information for future prosecution.  At trial, Officer Hicks testified that he spent about an hour with Guray, RT 800, but presumably that estimate included not only the time that Officer Hicks received her statement, but also the time that Officer Hicks spent with Guray looking around the scene of the robbery.  RT 695-97, 798-99.  Also at trial, Officer Hicks testified that during his encounter with Guray she gave him a description of the three men who had entered the residence.  RT 801-02, 805.  This effort to learn more about the alleged perpetrators would be precisely the type of information that may be included in a nontestimonial statement, since the officers must know whether they might be encountering a violent felon while attempting to resolve the present emergency.

The formality of police questioning was not addressed in detail at trial, but it is clear that Officer Hicks did not initiate the contact, nor did he have any foreknowledge of the situation.  Guray approached the officer, and she asked if she could talk to him.  RT 694.  Her statement was given in the field during the early morning hours of Christmas Day.  It was not taken at the station house.  The record gives no reason to believe that it was taped.

The record is not clear as to the focus of Officer Hicks's questioning.  Indeed, the record does not reveal whether, or to what extent, Guray's various statements were the product of questioning by Officer Hicks, nor whether any of Officer Hicks's questions were directed toward recording past acts, as opposed to enabling him to assess the danger of the situation.  *See Davis,* 547 U.S. at 827.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

29

The record does show that, on cross-examination at the in limine hearing, trial counsel asked Officer Hicks, "Did you ask any questions that might reflect on whether or not she was telling the truth?"  (RT 702.)  Office Hicks replied

> We went over the story quite a few times.  *She didn't really waiver from her initial statement*, and so I usually do that three times, and usually the third time if it's the same as the first time, then I'll just take their word along with the visual evidence that we had. It pretty much corroborated her story.

*Id*.; emphasis added.

Also on cross-examination at the in limine hearing, Officer Hicks was asked about the procedure he followed when Guray contacted him:

> Q. Did you write a report?
> A. Yes, I did.
> Q. Did you take notes regarding her statement to you?
> A. *Took notes on particular details, but just the story I took verbally.*
> Q. You took some handwritten notes?
> A. Yes.
> Q. And you entered those on a note pad?
> A. No, a little three by five card.
> Q. You later wrote a report?
> A. Yes.
> Q. And how long after your contact with Ms. Guray did you write this report?
> A. It was immediately after.
> Q. Within an hour?
> A. Yes.

RT 700; emphasis added.

Whether or not Officer Hick's notes and report are testimonial is of no significance here. Nor does it matter what Guray said to Officer Hicks on her second and third iteration of events because, as Officer Hicks clearly stated during the in limine hearing, Guray "didn't really waiver from her initial statement," RT 702, and as he said when testifying before the jury, there were no "significant differences" in the three times that Guray recounted the facts for Officer Hicks.  RT 804. Thus, the state appellate court attempted to determine which, if any, of Guray's statements to Officer Hicks were testimonial and which were nontestimonial.  *See Davis*, 547 U.S. at 828-29 (distinguishing between portions of a statement that are nontestimonial and other portions which are testimonial).  Here, since Officer Hicks testified that there was no substantial difference between the three renditions of Guray's statement to Officer Hicks, the issue here turns on the admissibility of

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

30

1   the first rendition.  If parts of that first rendition was nontestimonial, then the admission into

2   evidence of those parts of Guray's statement did not implicate the right of confrontation, and even

3   if some of all of Guray's statements during the second and third renditions were testimonial, they

4   were merely cumulative, and therefore harmless.

5          It is uncertain whether there was any interrogation at all by Officer Hicks during Guray's

6   initial statement, but even if Officer Hicks did question her during her first statement, "a

7   conversation which begins as an interrogation to determine the need for emergency assistance,"

8   without more, is distinct from a testimonial statement.  *Davis*, 547 U.S. at 828-29.  Continued

9   questioning, e.g., "structured police questioning," after Officer Hicks had gained sufficient

10  information to address the exigency of the moment, could have rendered any subsequent statements

11  testimonial in nature, *id.*, but it appears that Guray's initial statement to Officer Hicks, when viewed

12  in context of the entire situation contained nontestimonial statements, as the state appellate court

13  found.

14         In *Davis*, the Supreme Court expressly held that even where there is some on-the-scene

15  questioning, that questioning may yield nontestimonial answers.  *Davis*, 547 U.S. at 832.  For

16  example, in "domestic disputes . . . '[o]fficers called to investigate . . . need to know whom they are

17  dealing with in order to assess the situation, the threat to their own safety, and possible danger to

18  the potential victim.'  *Hiibel* [*v. Sixth Judicial Dist. Court of Nev.*, *Humboldt Cty.* (2004) 542 U.S.

19  177], 186 . . . .  Such exigencies may *often* mean that 'initial inquiries' produce nontestimonial

20  statements."  *Davis*, 547 U.S. at 832.  That Officer Hicks may have asked some questions related

21  to identification and location of the at-large suspects, or to clarify a point brought up by Ms. Hicks,

22  would not have converted the conversation into a formal, structured interrogation that produced a

23  statement which was wholly testimonial.  The officer would likely have had to ask at least some

24  preliminary questions simply to determine the nature of the incident, and to identify any then-

25  existing potential for danger posed by the robberies.  *See id*.

26         The record amply supports the state appellate court's holding that the portions of Guray's

27  statements (or at least the portions of her first statement) in which she told the officer "that her car

28  keys had been stolen when three persons she knew as Cootie, Travieso and Jesse came into an

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

apartment nearby and robber her and her two friends–must be considered nontestimonial," Exh. Z

at 14, so that Officer Hicks could resolve whether there was any ongoing emergency.  A statement

made directly to the police still may be nontestimonial if it informs the police about the identity of

the assailant, thereby allowing the police to know whether they may encounter a violent felon in the

course of resolving the present emergency.  *Davis*, 547 U.S. at 827.

In sum, the state court determination that some, but not all, parts of Guray's statement

were nontestimonial was a reasonable application of *Davis* and *Crawford*, given the time and place

of the statement; the fact that Guray approached the officer; the fear and distress that she exhibited;

the relatively short period of delay between the robbery and Guray's statement to the police, the

explanation for any delay in contacting the police; the fact that her friend Reinthaler had already left

with her mother; the fact that Guray had been left there alone; the fact that Guray was without a

phone and without her car keys; Guray's legitimate fear that the armed trio would return to steal her

car; petitioner's threat to kill her if she reported the case to the police; Officer Hicks's heavy

reliance, initially, on Guray's "verbal statement;" and the apparent absence of formalized

interrogation.  At least part of Guray's statement, objectively considered, was a cry for help–i.e., it

was not testimonial, so therefore the Confrontation Clause was not implicated as to those parts.

### 2.    The Sufficiency Of The Record

Second, petitioner claims that the Court of Appeal made an unreasonable determination

of the facts relevant to his *Crawford* claim because his trial predated *Crawford*, and the in limine

hearing which was conducted at the time of trial did not squarely address the question whether

Guray's statement to Officer Hicks was testimonial.  Therefore, he argues, his case must be

remanded for an evidentiary hearing to determine whether any portion of Guray's statement to

Officer Hicks was nontestimonial.  Ptn., Memo. of P.'s and A.'s at 17-18.  However, as to the

limited holdings of the appellate court, the record leaves no legitimate room for dispute.  The record

amply establishes that the part of Guray's pretrial statement in which she sought police assistance

because she was locked out of her car and feared the imminent return of the people who had stolen

her keys was nontestimonial.  Moreover, as the California Court of Appeal ultimately held, in a

holding which the record fully supports, the admission of Guray's entire statement through the

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

32

1    testimony of Officer Hicks was harmless beyond a reasonable doubt.

2        **3.    The Availability Of Harmless Error Analysis**

3        Third, *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56 (1980). *Crawford v. Washington*,

4    541 U.S. at 62. Petitioner quotes from a portion of *Crawford* wherein the Supreme Court refused

5    to resolve the case then before it by reweighing the indicia of reliability attached to the challenged

6    evidence, an approach which had previously been adopted under *Roberts*, 448 U.S. at 66, for the

7    purpose of deciding whether certain evidence relating to out-of-court statements met the

8    constitutional requirements of the Sixth Amendment's Confrontation Clause for admissibility. The

9    indicia identified in *Roberts* included consideration of whether the evidence fell within a firmly-

10   rooted hearsay exception, or alternatively, whether the evidence was accompanied by a showing of

11   particularized guarantees of trustworthiness. *Roberts*, 448 U.S. at 66. *Crawford* held that the

12   Constitution, itself, prescribed the proper foundational requirement for determining the reliability

13   of testimony in criminal trials, and what the Sixth Amendment requires is confrontation. *Crawford*,

14   541 U.S. at 67-68. *Crawford* stated that neither the Supreme Court nor any state court was clothed

15   with authority to devise a test of reliability different from the one provided by the Sixth Amendment,

16   namely confrontation. *Id*. Based upon this passage lifted from *Crawford*, petitioner argues that the

17   California Court of Appeal erred by engaging in harmless error analysis. Ptn., Memo. of P.'s and

18   A.'s at 18.

19       Petitioner equates *Crawford's* rejection of the *Roberts* test of reliability–which was based

20   upon judicially recognized factors such as the applicability of a firmly-rooted hearsay exception or

21   particularized guarantees of trustworthiness–with the notion that the admission of evidence in

22   violation of the Sixth Amendment right to confrontation is reversible per se. That clearly is not the

23   case. Alleged violations of the Confrontation Clause are subject to harmless error analysis. *Coy v.*

24   *Iowa*, 487 U.S. 1012, 1021-22 (1988) (an assessment of harmlessness cannot include consideration

25   of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered,

26   had there been confrontation; such an inquiry would obviously involve pure speculation, and

27   harmlessness must therefore be determined on the basis of the remaining evidence); *Delaware v.*

28   *Van Arsdall*, 475 U.S. 673, 684 (1986) (whether a violation of the Confrontation Clause is harmless

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1   depends upon the importance of the witness's testimony in the prosecution's case, whether the

2   testimony was cumulative, the presence or absence of evidence corroborating or contradicting the

3   testimony of the witness on material points, the extent of cross-examination otherwise permitted,

4   and the overall strength of the prosecution's case); *see, e.g., Harrington v. California*, 395 U.S. 250,

5   254 (1969); *Schneble v. Florida*, 405 U.S. 427, 432 (1972); *see also, Winzer v. Hall*, 494 F.3d 1192,

6   1201 (9th Cir. 2007); *Whelchel v. State of Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).

7   **E.   The Introduction Of Guray's Entire Pretrial Statement Was Harmless Under *Brecht***
       **[*v. Abrahamson*], 507 U.S. 619, 638**

8

9   Aside from petitioner's misguided suggestion that harmless error analysis is not available

10  in any case where a defendant's constitutional rights of confrontation and cross-examination under

    *Crawford* are violated, Ptn., Memo. of P.'s and A.'s at 18, he does not contest the state appellate

11  court's critical determination that petitioner's Sixth Amendment claim involving the introduction

12  of Guray's statement was not reversible because "the admission of the entire statement was harmless

13  beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.)"  Exh. Z at 15.

14  Since the United States Supreme Court decided *Fry v. Pliler*, ___U.S. ___, 127 S.Ct. 2321

15  (2007), it is clear that

16
        in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in
17      a state-court criminal trial under the "substantial and injurious effect" standard set forth
        in *Brecht* [*v. Abrahamson*], 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 [(1993)],
18      whether or not the state appellate court recognized the error and reviewed it for
        harmlessness under the "harmless beyond a reasonable doubt" standard set forth in
19      *Chapman*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705.

20  *Fry*, 127 S.Ct. at 2328; *accord, Winzer*, 494 F.3d at 1201.

21  Even though petitioner does not challenge the state court finding that the introduction of

22  Guray's statement was non-prejudicial, the harmlessness of introducing Guray's statement fully

23  insulates the state court judgment from all of petitioner's complaints about the introduction of her

24  pretrial statement.  As the state court of appeal found, the essential elements of the robbery, assault,

25  and firearm use were supported by those nontestimonial statements of Guray which were not

26  excludable, in combination with Reinthaler's testimony and prior inconsistent statements, Lopez's

27  testimony, and corroborative evidence gathered by the police.  This evidence showed that petitioner

28  was one of the intruders, that he brandished a gun at Reinthaler, that Guray was in the bathroom

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

34

1    when petitioner broke down the bathroom door, that Guray was screaming, and that her car keys

2    were stolen.  The robberies of Guray and Lopez, the assault upon Guray, and the firearm use

3    enhancements were supported by the inferences raised by evidence independent of Guray's

4    statement.

5        More specifically, the state-court judgment should remain undisturbed because the

6    introduction of Guray's statement was entirely harmless.  In the Appellant's Opening Brief on direct

7    appeal, petitioner "concede[d] that the testimony of Lopez [was] sufficient to establish the robbery

8    of Sal Lopez."  Exh. R. at 20.[26/]  It would appear, therefore, that even if petitioner could demonstrate

9    a basis for habeas relief and could establish prejudice, he would only be entitled to reversal of counts

10   one and two, wherein Guray was alleged to be the victim.

11        In any event, the evidence regarding Guray's statement to Officer Hicks was merely

12   cumulative to the testimony of Lopez and Reinthaler regarding the robbery of Lopez, as charged in

13   count three.  The introduction of Guray's statement, to the extent that it bore at all on that count,

14   could not have had any substantial and injurious effect or influence in determining the jury's verdict

15   as count three.  *Brecht*, 507 U.S. at 637-38.  Count three clearly should remain undisturbed.

16        Even the counts involving the robbery of, and assault upon, Guray (counts one and two,

17   respectively) should likewise remain undisturbed because the introduction of Guray's out-of-court

18   statement to Officer Hicks was harmless.  Aside from Guray's statement and her identification of

19   petitioner from a photo display presented in court through Officer Tepoorten, *see* RT 823-24, 852-

20   53; People's Exh. 17, there was evidence that Guray's purse, which was previously at the residence,

21   was missing after the intruders left.  RT 1003.  There was evidence that an identification card with

22   Guray's photograph on it (People's Exh. 3) was later seized from Siller's (Travieso's) house shortly

23   after the crimes.  RT 579-80, 796, 820; *see also* RT 825-26.)  The evidence independent of Guray's

24   statement, and logical inferences therefrom, explain the felonious context in which Guray's purse

25   became missing and Guray's identification card came to be at the house of Siller.

26

27   ─────────────────────────────────────

28        26.  Reinthaler's testimony also strongly corroborated Lopez's testimony.  What Guray told
     Officer Hicks shortly after the robbery was merely cumulative.

     *Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
     PJH (PR)

1    Lopez testified that at least some of the intruders were armed with a gun, RT 562-63

2  (Siller), 629-30 (Siller); *see* RT 576 (Herrera reached under his sweater as if he had a weapon), 643-

3  645 (same), and that petitioner and a man with a gun approached the bathroom. Petitioner then

4  kicked the door in and entered the bathroom. Lopez said he could hear Guray crying inside the

5  bathroom. RT 566-67. When petitioner and Siller came out of the bathroom, petitioner repeatedly

6  yelled at Lopez, "Break yourself," and while the gunman pointed his weapon at Lopez, petitioner

7  ripped a silver chain from Lopez's chest. RT 572-75. This evidence clearly established that the

8  robbers intended to take personal property from the occupants of the house by force or fear.

9    Reinthaler's testimony, regarding the circumstances of the home invasion, when combined

10  with this testimony by Lopez, with the evidence of the missing purse, and with evidence regarding

11  the seizure of Guray's identification card from Siller's house, cements the case that Guray was

12  robbed and assaulted. In specific, Reinthaler testified that she saw a gun in the hand of the first

13  person who entered her house. That person pushed her into the kitchen, RT 990-91, and then

14  immediately proceeded to the bathroom adjacent to the kitchen. RT 994, 996. Reinthaler then heard

15  loud banging noises coming from the bathroom, where Guray was located. Reinthaler also heard

16  Guray screaming and yelling. RT 992-93, 996. It sounded like there was also some arguing in the

17  bathroom. RT 997, 1002-03. Later, Reinthaler heard men in the living room demanding that Lopez

18  hand over his personal property. RT 993. One of the men had his arm raised toward Lopez like he

19  was pointing a gun at him. RT 997. It was during this melee that Guray's purse became missing,

20  RT 1003, and a few days later, Guray's identification card turned up in the search of Siller's

21  residence. RT 580, 825; People's Exh. 3. Also, the physical evidence showed that the lock on the

22  bathroom door had been broken, and the shower door was off its track, corroborating the evidence

23  that Guray was assaulted in the bathroom.

24    In context, the circumstantial evidence that petitioner robbed and assaulted Guray while

25  she was in the bathroom was quite strong, even without considering Guray's out-of-court statements.

26  Her live testimony would have been cumulative of the other evidence, independent of what she told

27  Officers Hicks and Tepoorten. Counts one and two, involving Guray should remain undisturbed,

28  as well as count three, wherein Lopez was the victim. The introduction of Guray's pretrial statement

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1  had no substantial and injurious effect or influence upon the jury's determination of any of the

2  factual issues that it was required to decide.

3  //

4  //

5  //

6  //

**II.**

**THE TRIAL COURT DID NOT VIOLATE PETITIONER'S SIXTH AMENDMENT RIGHT OF CONFRONTATION BY ADMITTING DOCUMENTARY EVIDENCE OF THE GUILTY PLEAS OF CO-DEFENDANTS SILLER AND HERRERA (PEOPLE'S EXHIBITS 37 AND 38) TO ESTABLISH A PATTERN OF CRIMINAL ACTIVITY AT THE BIFURCATED TRIAL OF THE GANG ENHANCEMENTS CHARGED AGAINST PETITIONER**

**A.   The Record**

After petitioner had been convicted of the substantive crimes, petitioner's case proceeded

with a bifurcated trial of the gang enhancement allegations. Pen. Code § 186.22, subds. (b)(1) and

(b)(4); *see* CT 174-82. At the trial of the gang enhancements, the prosecutor offered numerous

documentary exhibits. People's Exhs. 33 through 38; CTA 1-69; CT 347-48, 355-56; RT 1283-98,

1342, 1347. People's Exhibits 37 and 38 consisted of certified minute orders for July 14, 2003,

reflecting that petitioner's co-defendants, Stiller and Herrera, had been also charged in the same

information as petitioner and had been convicted in the instant case, upon their guilty pleas, as to

counts one and three, the robberies of Guray and Lopez, and that they had admitted the personal use

of a firearm and the gang enhancements as to both counts. CTA 66-69; *see* RT 1297-98.

Petitioner objected to the introduction of People's Exhibits 37 and 38, but the trial court

admitted those exhibits. RT 1347; CT 348, 356. The evidence at the trial of the gang enhancement

also included documentary evidence showing the unrelated convictions of other individuals,

People's Exhs. 33-36, who were members of the Capital Park Locos (CPL) gang. RT 1283-96,

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

37

1  1341; CT 347-48, 355-56; CTA 1-65.[27/]

2       At the close of evidence, the parties argued the case, CT 348; RT 1347-55, and then the

3  court instructed the jury with respect to the gang allegations.  CT 313-25; RT 1355-63.  The trial

4  court gave a special limiting instruction with respect to People's Exhibits 37 and 38, as follows:

5      The exhibits that are marked 37 and 38, which you will see in the jury room, they are the
    copies the guilty pleas and admissions of Siller and Herrera, co-defendants.  They have

6      been presented by the People to show a pattern of criminal activity.  They are not to be
    considered by you as proof that the defendant had a specific intent to promote, further, or

7      assist in any criminal conduct by gang members, or that the crimes charged were
    committed by the defendant for the benefit, at the direction of, or in association with a

8      criminal street gang.  So that is limited.

9  RT 1356.

10

11       After the jury returned its verdicts finding the gang enhancements true, CT 343-45, 346,

12  349; RT 1364-65, trial counsel stated for the record his objections to People's Exhibits 37 and 38.

He said:

13

14      Very briefly, Your Honor, regarding, I believe, it's Exhibit Number 37 and 38, just to
    explain, briefly explain the grounds for my objection, to further explain my objection.  I

15      don't have any of my notes in front of me, but I believe I want to object on relevance,
    hearsay, and Evidence Code section 352.

16  RT 1367; *see* CT 349.

17      The trial court then expressed for the record:

18      Now, as I stated in the case in chief, when the People made the request to bring in the
    prior convictions or the guilty pleas of the co-defendants, I did the weighing process and
    I didn't allow the evidence in on the basis because I felt that the prejudice outweighed the

19      probative value.  When the People again asked to present that in the bifurcated portion of
    the trial, I indicated they could bring it in for a limited purpose, to show the criminal

20      activity based on my weighing of Evidence Code section 352, and in doing the weighing
    process I felt that the prejudicial value was not outweighed for the purpose of, the limited

21      purpose, of bringing it in the way I outlined to the People.

22  RT 1368.

23

24  **B.  Petitioner's Contentions**

25       First, petitioner argues that the documents reflecting the co-defendants' guilty pleas were

26  testimonial, and therefore, their admission into evidence violated his constitutional right of

27

28      27.  Exhibits 33 through 36 were admitted without any defense objection.  RT 1341.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1  confrontation.  Apparently, petitioner's theory that the records were testimonial is based upon the

2  view that the court documents embodied declarations of guilt by each co-defendant.  Ptn., Memo.

3  of P.'s and A.'s at 22.

4      Secondly, petitioner argues that, because the jury had already found petitioner to have

5  committed the underlying offenses, documentary evidence suggesting that each co-defendant had

6  confessed to the robberies  and admitted the gang enhancements constituted testimonial evidence

7  that the co-defendants had acted together, in concert, and on behalf of a gang, and further, that the

8  co-defendants did so *with a third person, i.e., petitioner, who was also acting on behalf of a gang.*

9  Petitioner argues that these alleged confessions and admissions–including admissions that the co-

10  defendants had acted in concert with petitioner–any reasonable juror would have used the alleged

11  confessions and admissions as evidence that petitioner necessarily acted in concert with the co-

12  defendants in a gang crime.  Ptn., Memo. of P.'s and A.'s at 22-24.

13      Petitioner further argues that, in light of a challenged portion of the prosecutor's closing

14  argument, the  trial court's limiting  instruction was  ineffective  to  preclude  the  jurors  from

15  considering People's Exhibits 37 and 38 as sufficient, in themselves, to support a true finding as to

16  the gang enhancement which was charged against petitioner.  Ptn., Memo. of P.'s and A.'s at 24-25.

17  **C.    The State Court Determination Of This Issue**

18      On direct appeal, the California Court of Appeal rejected petitioner's claims that the court

19  records reflecting the co-defendants' convictions and enhancements were testimonial and that their

20  introduction violated his constitutional right to confrontation.  In pertinent part, the opinion of the

21  Court of Appeal stated as follows:

22      Defendant also argues that the documentary evidence of codefendants' pleas and
       admissions was testimonial hearsay within the meaning of *Crawford v. Washington*, and
23      that its introduction violated his constitutional confrontation rights.  [Footnote omitted.]
       We find no merit in this contention. As those exhibits were used here, they were not
24      testimonial. In the first place, they did not incriminate defendant. Herrera's and Siller's
       pleas inculpated only themselves; in no way did their pleas implicate defendant as the
25      third person who invaded Reinthaler's apartment. Second, the pleas were offered for a
       nonhearsay purpose: as circumstantial evidence of a pattern of gang activity by two
26      members of the CPL gang for the purposes of promoting the gang. The pleas and
       admissions were relevant for that purpose regardless of whether defendant was guilty of
27      the same crimes, or even if the pleas did not accurately reflect Herrera's and Siller's
       involvement in the crimes, because they tended to prove, along with other evidence, that
28      Herrera and Siller were members of the CPL gang, and that together they were convicted

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

39

1
2
3
4
5
6
7

of committing two crimes for the benefit of the gang. "Because [the] statements were admitted for a nonhearsay purpose, their admission did not, as defendant contends, violate the confrontation clause of the Sixth Amendment of the federal Constitution. 'The Clause…does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 707, fn. 18, quoting from *Crawford v. Washington, supra*, 541 U.S. at p. 59, fn. 9 [victim's identification of defendant in photographic lineup did not violate *Crawford* because it was relevant for the nonhearsay purpose of establishing that defendant's motive for killing him was to eliminate him as a witness, and was relevant regardless of whether identification was accurate].)  Finally, we find nothing in *Davis* that lends support to defendant's argument that the codefendants' pleas and admissions, as used here, were testimonial. In our view, the introduction of Herrera's and Siller's pleas and admissions did not violate defendant's confrontation rights.

8

Exh. Z at 23-24.

9
10
11

**D.  The State Court Determination That The Introduction Of Documentary Evidence Showing The Co-defendants' Convictions And Enhancement Findings Did Not Violate Petitioner's Right To Confrontation Was Neither Contrary To, Nor Did It Involve An Unreasonable Application Of Clearly Established Federal Law, As Determined By The United States Supreme Court, 28 U.S.C. § 2254(d)(1)**

12
13
14
15
16
17
18
19
20
21
22
23

Petitioner's claim that the documentary evidence here was "testimonial" appears to be based upon the premise that the records of his co-defendants' convictions and enhancement findings included some mention of their admissions of guilt and, implicitly, of having committed the charged offenses and enhancements.  Ptn., Memo. of P.'s and A.'s at 22.  Thus, he cites several Second Circuit cases which he contends "have concluded that guilty pleas by a co-defendant are testimonial."  *Id*. at 24.  However, the first case, and the most recent case, which he cites for that proposition, *United States v. Banks*, 464 F.3d 184, 189 (2d Cir. 2006), merely states, "The Government does not dispute that the pleas, allocutions, and post-arrest statement made at a proffer session constitute 'testimonial statements' of the sort barred by *Crawford*.  We assume without deciding that this characterization is correct.  *Cf. United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (holding that a plea allocution is a testimonial statement) . . . ."[28/]

24

25
26
27
28

28.  "The allocution contains a confession to all of the required elements of the crime.  As a result, the allocution is implicit in the guilty plea, and the guilty plea qualifies as 'testimonial' under *Crawford*."  *United States v. Massino*, 319 F.Supp.2d 295, 299 (E.D.N.Y 2004).  "The fact that a co-defendant pleaded guilty is only significant because of its confessional nature."  *Id*.  "As a result, the fact that an individual pleaded guilty necessarily embodies the testimonial statement made by an individual at the time he made the plea."  *Id*.  Of course, none of this addresses the situation here where the documentary evidence was introduced exclusively to prove that the co-

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

1    Even if it be true that a co-defendant's "plea allocution" is testimonial in nature, the

2    documents admitted in our case were not admitted for the purpose of demonstrating that the co-

3    defendants had made confessions or declarations against their own penal interest which established

4    that they had engaged in the conduct underlying the charges against them.  The minute orders here

5    were offered merely to show that the co-defendants had been convicted of the charged robberies.

6    Petitioner misstates the purpose for which the minute orders were offered at the bifurcated

7    hearing on the gang enhancement charged against petitioner.  The minute orders were not offered

8    to prove the conduct of petitioner's co-defendants, to prove that they acted in concert with petitioner,

9    or to prove that they acted for the benefit of, at the direction or, or in association with any street

10   gang, or that they specifically intended to promote, further, or assist in any criminal conduct by gang

11   members.  Rather, they were offered to prove that the co-defendants had been convicted of certain

12   statutorily-enumerated offenses essential to a finding that the gang enhancement charged against

13   petitioner was true.

14   One of the elements of California's gang enhancement is that the underlying crime was

15   committed for the benefit of, at the direction of, or in association with any criminal street gang.  Pen.

16   Code § 186.22(b).  A "criminal street gang" is statutorily defined in terms of members who

17   "individually or collectively engage in or have engaged in a pattern of criminal gang activity."  Pen.

18   Code § 186.22(f).  As explained in *People v. Duran*, 97 Cal.App.4th 1448 (2002), since 1996, Penal

19   Code section 186.22(e) has defined a "pattern of criminal gang activity" as the commission of,

20   attempted commission of, conspiracy to commit, or solicitation of, *sustained juvenile petition for,*

21   *or conviction of* two or more of the following [enumerated] offenses. . . ."  *Id.* at 1461-62 & n. 5

22   (emphasis in *Duran*).  The italicized language which was added in 1996 allows proof as to the fact

23   of conviction as a means of proving the predicate offenses which are required for the "pattern of

24   criminal gang activity," which in turn must be proven in order to establish a "criminal street gang"

25   finding.  This statutory change allowed the People to prove the fact of a conviction of an enumerated

26

27

28   defendants had simply been found guilty of certain predicate offenses which, in turn, were essential
     to a true finding as to the gang enhancement which was charged against petitioner.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1  offense instead of the conduct underlying that conviction.

2      Thus, prosecutors may now use prior court records as proof of prior convictions, instead

3  of requiring them to produce witnesses to the original crime to testify regarding the facts of the prior

4  crime. Now, a minute order can satisfy the proof requirement for establishing convictions for the

5  requisite predicate offenses without any issues arising as to whether the recordation of a conviction

6  within the document embodies a defendant's declaration against interest, judicial confession, or

7  admission. *Id.* Accordingly, a minute order recording a conviction is all the evidence required to

8  establish the fact of a prior conviction for an enumerated offense. Even if petitioner's co-defendants

9  were called as witnesses at petitioner's trial, and even if they were to disclaim their guilt, their

10  testimony would have no bearing on the admissibility of the minute order to prove their convictions.

11      Typically, a prior conviction may be proven in California by introducing a court document

12  such as an abstract of judgment or a minute order. *See People v. Delgado*, ___Cal.4th ___, 2008

13  Cal. LEXIS 6636 at p. * 7 (May 29, 2008); *People v. Wheeler*, 4 Cal.4th 284, 300 n. 13 (1992)

14  (citing Cal. Evid. Code §§ 1271 and 1280) (the business records and official records exceptions to

15  the California hearsay rule, respectively, provide for the admission of court records to prove that the

16  conviction occurred, but not to prove the underlying criminal conduct; "an admissible record is

17  competent only to prove the act it records"); *People v. Duran*, 97 Cal.App.4th at 1461-62 & n. 5

18  (certified minute order of conviction admissible under the official records exception Cal. Evid. Code

19  § 1280 and under the more specific provision of California Evidence Code section 452.5(b) "to

20  prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction,

21  service of a prison term, or other act, condition, or event recorded by the record"); *see also* Pen.

22  Code § 969b.

23      The question here, however, is not whether the minute orders were admissible as

24  exceptions to the hearsay rule, but whether the constitutional right of confrontation precluded their

25  admission. In *People v.Woodell*, 17 Cal.4th 448 (1998), the California Supreme Court recognized

26  the admissibility of an appellate opinion, "not to show exactly what the defendant did, but to show

27  whether the trial court found, at least impliedly, that the conviction was based on personal use rather

28  than vicarious liability." *Id*. at 460. *Woodell* held that where the factual issue before the court has

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

42

1    to do with the nature of the crime of which the defendant was previously convicted, the issue may

2    be decided by looking to a court ruling (in *Woodell* it was an appellate opinion) "for the *nonhearsay*

3    purpose of determining the basis of the conviction." *Id.* at 459 (emphasis added); *accord, Delgado*,

4    2008 Cal.LEXIS 6636 at p. *21 n. 6.  "The admissibility of an appellate opinion used for this

5    nonhearsay purpose does not turn on whether each factual statement in that opinion comes within

6    an exception to the hearsay rule but on whether the opinion logically shows what the original trial

7    court found was the basis of the conviction." *Woodell*, 17 Cal.4th at 460.  The written statement of

8    what the trial court found in the co-defendants' cases was nonhearsay.  *Id.* at 461.

9         It appears that the California Court of Appeal referred to the minute orders recording the

10   co-defendants' convictions in the same manner as the California Supreme Court in *Woodell* referred

11   to the appellate opinion which was considered there:  they had been offered for a nonhearsay

12   purpose, i.e., to show that the documents stated that they had been convicted of certain offenses,

13   which in turn would be circumstantial evidence tending to establish a pattern of gang activity.

14        California thus considers the use of certified court documents offered to establish the fact

15   of conviction to be a nonhearsay use of the document.  The minute orders were offered here merely

16   to show that the trial court had convicted petitioner's co-defendants of certain qualifying offenses.

17   The minute orders thus supplied evidence that helped establish a pattern of criminal gang activity,

18   but they were not offered to show the co-defendants' underlying conduct.  This was nonhearsay.

19   "The Confrontation Clause . . . does not bar the use of testimonial statements for purposes other than

20   establishing the truth of the matter asserted," *Crawford*, 541 U.S. at 59 n. 9; *see Tennessee v. Street,*

21   471 U.S. 409, 414 (1985); *United States v. Mitchell*, 502 F.3d 931, 966 (9th Cir 2007).  Thus, the

22   minute orders introduced for a nonhearsay purpose did not raise any Confrontation Clause concerns.

23   Hence, the state court determination of this issue was neither contrary to, nor an unreasonable

24   application of clearly established federal law as determined by the Supreme Court of the United

25   States.  28 U.S.C. § 2254(d)(1).

26        The state appellate court not only found the minute orders to be nonhearsay, but also

27   nontestimonial.  The purpose for which a court clerk records a defendant's guilty plea in a minute

28   order is not "testimonial" as that word is used in *Crawford* and *Davis*.  It is a memorialization of a

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

43

court proceeding. To the extent that it simply records the fact of a conviction, it has nothing to do with the examination of accusers, suspects, or witnesses. It does not involve the investigation of past criminal conduct, nor does it involve any prosecutorial function. Although such records are often admitted as proof of recidivism, the reason for their preparation is not so the clerk can bear witness against persons described in such orders. Rather, when the clerk, acting to memorialize the court's action, records in a minute order that a particular defendant was convicted of a particular crime, he speaks for the court. The statement of the court, as thus recorded, is not prepared as evidence against either the defendant in the prior case, nor typically to provide evidence against other potential defendants. Furthermore, as the state appellate court pointed out, the minute orders involving petitioner's co-defendants did not inculpate petitioner. The co-defendants' pleas did not implicate petitioner as the third person who invaded Reinthaler's apartment. Exh. Z at 24. The state court determination was not contrary to, or an unreasonable application of *Crawford* or *Davis*. Accordingly, there is no basis for federal habeas relief.

Finally, even if the minute orders introduced here were entirely hearsay, including the portion which merely recorded the convictions and the findings as to any enhancements, the minute orders were admissible, as we have noted, as official records under California Evidence Code sections 452.5 and 1280. Official records are but specialized forms of business records, admissible under California Evidence Code section 1271, with only some slight differences in the required foundational showings, 29B, Part 4, West's Annot. Cal. Codes, Evid. Code § 1280, Law Revision Commission Comment, at p. 347; 1 Witkin, Cal. Evid. (4th ed. 2000) Hearsay, § 246, p. 964.

*Crawford* states that the Sixth Amendment is "most naturally read as a reference to the right of confrontation at common law, *admitting only those exceptions established at the time of the founding.*" *Crawford*, 541 U.S. at 54 (italics added).) Among the exceptions which *Crawford* found to have been well established by 1791 was the business records exception, which *Crawford* describes as a "hearsay exception[] that covered statements that by their nature were not testimonial." *Id.* at 56. Accordingly, since the business records exception essentially includes the official records exception, and since *Crawford* views business records, by their nature, as nontestimonial, *id.* at 56, *Crawford* does not support petitioner's contention that his right to

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

44

1    confrontation was violated by the introduction of People's Exhibits 37 and 38.

2         In any event, since the exception for business records predates 1791, the introduction of

3    routine business (or official) records should not give rise to any constitutional requirement that the

4    clerk who prepared the court's document, or any person who was the source of information recorded

5    therein, be unavailable, or that such person or persons have been available previously for cross-

6    examination by the accused, in order for the document to be considered by a trier of fact.  The

7    reliability of the document to establish the fact of a conviction should be presumed so long as the

8    foundational standards of admissibility have been met.  *See Delgado*, 2008 Cal.LEXIS 6636 at pp.

9    *7-8; *see generally* Fed. R. Evid. 1005.

10   **E.    Neither The Introduction Of The Minute Orders, Nor The Prosecutor's Closing
         Argument, Prejudiced Petitioner At The Bifurcated Trial Of The Gang Enhancement**

11

12        Here, the jury's true findings regarding the gang enhancements should remain undisturbed

13   because no prejudice resulted under the *Brecht* standard.  *Brecht*, 507 U.S. at 637-38.  First, the trial

14   of the gang enhancements was bifurcated from the trial of the underlying charges.  The purpose of

15   the hearing on the gang enhancements was specific and very limited in scope.  When the minute

16   orders were introduced, petitioner had already been convicted by the same jury of all three

17   underlying charges.

18        The jury was instructed that the evidence of the co-defendants' guilty pleas could only be

19   considered for a very narrow purpose–they could only be considered on the question whether

20   members of the CPL had individually or collectively engaged in a pattern of criminal gang activity

21   by having committed, *or by having been convicted of,* certain enumerated offenses.  Thus, the jury's

22   consideration of the minute orders regarding the minute orders, People's Exhs. 37 and 38, was

23   limited to the issue of whether there was a pattern of gang activity by the Capital Park Locos.

24   Because the jury had been given a precise limiting instruction, the evidence could nto have had a

25   substantial or injurious effect on the verdict.

26        Additionally, there was such an abundance of other evidence of past convictions by other

27   members of the Capital Park Locos besides Siller and Herrera that a true finding as to CPL's pattern

28   of criminal gang activity was practically inevitable.  Aside from People's Exhibits 37 and 38, three

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

45

1  more sets of conviction records were placed in evidence to show a pattern of gang activity: (1) a

2  2002 conviction of Michael Hixon, a CPL member, for attempted murder conviction with personal

3  use of a firearm, RT 1283-84, 1287-89; CTA 1-21; People's Exh. 33; (2) a 1998 conviction of Frank

4  Gonzalez, a CPL member, for attempted murder with a gang enhancement, RT 1284, 1289-90; CTA

5  22-47; People's Exh. 34; and (3) a 1994 conviction (with sentencing in 1995) of Mario Herrera, a

6  CPL member, for assault with a deadly weapon with a gang enhancement. RT 1284, 1290-92; CTA

7  48-56; People's Exh. 35. The jury would have had no reasonable doubt that members of the CPL

8  gang individually or collectively engaged in a pattern of criminal gang activity.

9      All that was required for such a finding were two or more qualifying convictions of the

10  crimes enumerated in section 186.22(e) for crimes committed on separate occasions, or by two or

11  more persons. There were plenty of offenses for the jury to choose from, especially since the current

12  offense could also be counted as a predicate offense. *People v. Duran*, 99 Cal.App.4th at 1457.

13  Therefore, the introduction of People's Exhibits 37 and 38, if error, was completely harmless.

14  Exhibits 37 and 38 were completely cumulative of other properly admitted, and unrefuted, evidence

15  showing that members of CPL had engaged in a pattern of criminal gang activity.

16      The People's expert also provided additional independent evidence of CPL's pattern of

17  criminal gang activity. He testified that Capital Park Locos was still an "active criminal street

18  gang," RT 1286, and by definition, a "criminal street gang" engages in a pattern of criminal gang

19  activity.

20      In petitioner's opening brief on direct appeal, he stated, "At trial, it was not disputed that

21  petitioner had admitted being a member of the CPL in the past. *Nor was it disputed that CPL is a*

22  *criminal street gang* within the meaning of Penal Code section 186.22. The only issue was whether

23  petitioner committed the offense for the benefit of the CPL, or in a fit of enraged jealously because

24  Lopez was at Reinthaler's house when he called over there." Exh. R at 33 (emphasis added). If

25  petitioner genuinely conceded that CPL was a criminal street gang, then the pattern of criminal gang

26  activity is necessarily implied, by definition. Pen. Code § 186.22(f).

27      On the issue of whether CPL engaged in a pattern of criminal gang activity, i.e., the only

28  issue for which the trial court allowed the jury to consider People's Exhibits 37 and 38, petitioner

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

46

1    concedes that there was no real factual dispute.  On the issue of whether petitioner committed the

2    current offenses for the benefit of the CPL gang or whether he committed them out of jealousy,

3    People's Exhibits 37 and 38 could not be considered according to the trial court's instructions, and

4    in any event, those exhibits would not typically have spoken at all to petitioner's motives or his state

5    of mind.

6          There is no reason to believe that the jury violated the express admonition not to consider

7    People's Exhibits 37 and 38 as proof of specific intent to promote, further, or assist in any criminal

8    conduct by gang members, and not to consider People's Exhibits 37 and 38 as proof that the crimes

9    charged were committed by the defendant for the benefit, at the direction of, or in association with

10   a criminal street gang. RT 1356.  The evidence was not offered for those purposes, nor could it be

11   considered for those purposes.

12         Nevertheless, petitioner contends that the prosecutor argued to the jurors that People's

13   Exhibits 37 and 38 conclusively proved the gang enhancement, including the elements of specific

14   intent and that defendant had committed the crimes for the benefit of CPL.  According to petitioner,

15   the prosecutor's argument converted the documentary evidence of the co-defendants' convictions

16   into out-of-court statements which directly established petitioner's culpability for the gang

17   enhancement.

18         Let us consider the case of  *Bruton v. United States*, 391 U.S. 123  (1968), wherein the

19   Supreme Court held that the Confrontation Clause prohibits the introduction, at a joint trial, of the

20   confession of a non-testifying co-defendant *that implicates the defendant* in the charged crime.

21   *Bruton*, 391 U.S. at 126.  A limiting instruction directing the jury not to consider the out-of-court

22   statement against the non-declarant defendant is not a substitute for cross-examination. *Id.* at 137.

23         Our case is unlike *Bruton*.  First, the scope of *Bruton* has been limited by *Richardson v.*

24   *Marsh*, 481 U.S. 200 (1987), which held "the Confrontation Clause is not violated by the admission

25   of a nontestifying co-defendant's confession with a proper limiting instruction when, as here, the

26   confession is redacted to eliminate not only the defendant's name, but any reference to his or her

27   existence." *Id.* at 211.  Since the documents introduced here made no mention of petitioner, or any

28   reference to his or her existence, *see* CTA 66-69, our case is more like *Marsh* than *Bruton*.  While

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1   the limiting instruction given here was not for the jury to refrain from considering this evidence

2   against petitioner altogether, but rather, to consider it only for a proper purpose, i.e., a pattern of

3   criminal activity, the limiting instruction imposed a restriction which the jurors could easily abide

4   without having to engage in nearly impossible mental gymnastics.  The logical inconsistency

5   presented in *Bruton* of using the evidence against A, but not B, is not present here, so the usual

6   presumption that the jurors followed the trial court's instructions, *Francis v. Franklin*, 471 U.S. 307,

7   324 n. 9 (1985), remains viable in our case.

8        The co-defendant's confession in the *Marsh* case had been redacted so that it did not, on

9   its face, expressly inculpate the non-declarant defendant.  This fact distinguished the confession in

10  *Marsh* from the unredacted confession in *Bruton*.  The redacted confession in *Marsh* thus did not

11  link the non-declarant defendant with the charged offense except through other evidence, i.e., the

12  defendant's own testimony.  *Marsh*, 481 U.S. at 208.  Hence, there was no infringement of the right

13  of confrontation.  The *Marsh* situation is similar to the one at bar in that the documentary evidence

14  here did not directly or expressly inculpate petitioner.  As *Marsh* explains,

15        While the express incrimination of the confession in *Bruton* justified the belief the jury
          will likely disobey the instruction not to consider the evidence, there is no overwhelming
16        probability the jury will not obey the limiting instruction to disregard the confession in
          assessing defendant's guilt when the confession incriminates only by reference.
17
    *Marsh*, 481 U.S. at 208.
18
        In other words, "[s]pecific testimony that 'the defendant helped me commit the crime' is
19
    more vivid than inferential incrimination, and hence more difficult to thrust out of mind."  *Marsh*,
20
    481 U.S. at 208.  The right to cross-examine the declarant is essential in the situation where the out-
21
    of-court statement directly implicates the non-declarant defendant.  Where the linkage is by
22
    inference only (or *a fortiori,* by some statement that the prosecutor may have made in argument),
23
    a jury will more likely follow a limiting instruction that restricts the jury's consideration of the
24
    evidence.
25
        However, petitioner's argues that the prosecutor's argument provided a link between the
26
    minute orders and a determination that petitioner was automatically liable for the gang enhancement
27
    as charged.  Petitioner misreads the prosecutor's remarks.  The prosecutor argued:
28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

First of all, you have People's 37 and 38. That is the convictions for Siller and Herrera where they admitted that this case was for the benefit of the gang because they admitted the 186.22 enhancement, which we are now asking you to find true for the defendant. *That alone is sufficient.*

RT 1349:9-14 (italics added).

Petitioner objected "as to the reason that Siller and Herrera entered their plea." RT 1349:15-17. Petitioner now contends that the prosecutor's argument was an invitation for the jurors to find the gang enhancement true, based solely on People's Exhibits 37 and 38. However, when the quoted passage is considered in light of the immediately preceding passage, in which the prosecutor discussed the People's duty to prove two predicate acts to establish a pattern of criminal gang activity before the enhancement could be "valid," RT 1349:1-8, it becomes clear that the prosecutor was only arguing that the exhibits were sufficient to prove the predicate acts.

Later, when the trial court responded to petitioner's objection by telling the prosecutor, "I would ask you to restate that," RT 1349:18-19, the prosecutor stated:

Siller and Herrera plead [sic] guilty to the home invasion robbery. I read the record. You have a certified copy of those convictions. *Those are being offered as two of the predicate acts*, which is all that I need, so that's covered one.

RT 1349:20-25.

The prosecutor's follow-up comments also made clear that the only "link" he was trying to establish was a link between People's Exhibits 37 and 38 and a pattern of gang activity. RT 1350:1-5. He was not treating the documentary exhibits as evidence, which, without more, would support a true finding as to the gang enhancement. His comments were consistent with the trial court's subsequent limiting instruction. The documentary evidence, even when considered in light of the prosecutor's argument, did not prejudice petitioner.

Finally, these two documents, when considered together with testimony that Siller and Herrera were CPL members, RT 1304-07, were sufficient to prove that Siller and Herrera had been convicted of two or more of the enumerated offenses, namely robbery, thus establishing a "pattern of criminal gang activity," Pen. Code § 186.22(e), which is one of the elemental components of a "criminal street gang." Pen. Code § 186.22(f). There was no requirement that the jurors look beyond the face of the document to determine the *conduct* of Siller and Herrera.

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

49

1    The document, on its face, established that Siller and Herrera had incurred convictions

2 which might establish a pattern of criminal gang activity. No right of confrontation arose from the

3 introduction of People's Exhibits 37 and 38 that would entitle petitioner to explore whether Siller

4 and Herrera had entered judicial confessions, admissions, or declarations against their own penal

5 interest at the time they incurred their convictions or whether Siller and Herrera actually committed

6 the underlying crimes.

7    Analogously, if Siller and Herrera had been tried by a jury, convicted, and then the official

8 records of their convictions had been prepared and entered into evidence here, petitioner would not

9 have any valid Sixth Amendment right to go behind that document and to confront the prosecution

10 witnesses who appeared at the jury trial. The same result should obtain here.

11    Petitioner's rights to confrontation were not infringed. The admission of People's Exhibits

12 37 and 38 into evidence at the bifurcated trial of the gang enhancement had not substantial and

13 injurious effect or influence in the jury's determination of the truth of the gang enhancement charged

14 against petitioner. *Brecht*, 507 U.S. at 637-38. Petitioner has failed to state a case for federal habeas

15 relief. The jury's true findings as to the gang enhancements should remain undisturbed.

16

17

18

19

20

21

22

23

24

25

26

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

50

1

## CONCLUSION

2

3        Accordingly, respondent respectfully requests that the Petition for Writ of Habeas Corpus

be denied.

4

        Dated:  June 9, 2008

5

                                Respectfully submitted,

6
                                EDMUND G. BROWN JR.
7                                Attorney General of the State of California

                                DANE R. GILLETTE
8                                Chief Assistant Attorney General

9                                GERALD A. ENGLER
                                Senior Assistant Attorney General

10                                PEGGY S. RUFFRA
                                Supervising Deputy Attorney General
11

12                                **/s/ Mark S. Howell**

13                                MARK S. HOWELL
                                Deputy Attorney General
14
                                Attorneys for Respondent
15
SF2007402364

16

17

18

19

20

21

22

23

24

25

26

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

1

# TABLE OF CONTENTS

2

**Page**

3    STATEMENT OF THE CASE                                                                1

4    STATEMENT OF FACTS                                                                   4

5            A.  The Robberies And The Assault                                             4

6            B.  Officer Hicks' Testimony Regarding Guray's Out-of-Court Statement          9

7            C.  The Investigation                                                        11

8            D.  The Alibi Witnesses                                                      15

9            E.  The Bifurcated Trial Of The Gang Enhancement                             18

10   ARGUMENT                                                                            19

11   I.    THE INTRODUCTION OF OFFICER HICKS'S TESTIMONY
             ABOUT WHAT GUARY TOLD HIM IS NOT A GROUND FOR
12           ISSUANCE OF THE WRIT OF HABEAS CORPUS                                       19

13           A.  Introduction                                                           19

14           B.  The Record Which Was Before The Trial Court At The Time It Decided To
                  Admit Officer Hicks's Testimony About What Guray Told Him              20
15
             C.  The California Court Of Appeal's Determination Of The *Crawford* Issue   23
16
             D.  The State Court's Determination That The Initial Portion Of Guray's
17                Pretrial Statement Was Nontestimonial Was Neither Contrary To, Nor An
                  Unreasonable Application Of, *Crawford* Or *Davis*, 28 U.S.C. § 2254(d)(1),
18                Nor Was It Based Upon An Unreasonable Determination Of The Facts In
                  Light Of The Evidence, 28 U.S.C. § 2254(d)(2)                          25
19
             E.  The Introduction Of Guray's Entire Pretrial Statement Was
20                Harmless Under *Brecht* [*v. Abrahamson*], 507 U.S. 619, 638
21                                                                                       34

     II.   THE TRIAL COURT DID NOT VIOLATE PETITIONER'S
22           SIXTH AMENDMENT RIGHT OF CONFRONTATION BY
             ADMITTING DOCUMENTARY EVIDENCE OF THE GUILTY
23           PLEAS OF CO-DEFENDANTS SILLER AND HERRERA
             (PEOPLE'S EXHIBITS 37 AND 38) TO ESTABLISH A
24           PATTERN OF CRIMINAL ACTIVITY AT THE BIFURCATED
             TRIAL OF THE GANG ENHANCEMENTS CHARGED
25           AGAINST PETITIONER                                                          37

26           A.  The Record                                                             37

27           B.  Petitioner's Contentions                                               38

28           C.  The State Court Determination Of This Issue                            39

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

i

**TABLE OF CONTENTS  (continued)**

Page

1

2

3

4

D.    The State Court Determination That The Introduction Of Documentary
5           Evidence Showing The Co-defendants' Convictions And Enhancement
             Findings Did Not Violate Petitioner's Right To Confrontation Was
6           Neither Contrary To, Nor Did It Involve An Unreasonable Application Of
             Clearly Established Federal Law, As Determined By The United States
7           Supreme Court, 28 U.S.C. § 2254(d)(1)
                                                                                                                   40

8

E.    Neither The Introduction Of The Minute Orders, Nor The Prosecutor's
9           Closing Argument, Prejudiced Petitioner At The Bifurcated Trial Of
             The Gang Enhancement                                                                    45

10

11   CONCLUSION                                                                                    51

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

ii

1

## TABLE OF AUTHORITIES

2

**Page**

3 **Cases**

4  *Brecht v. Abrahamson*
   507 U.S. 619 (1993)                                    19, 20, 34, 35, 45, 50

5
   *Bruton v. United States*
6  391 U.S. 123  (1968)                                              47, 48

7  *Chapman v. California*
   386 U.S. 18 (1967)                                            20, 24, 34

8
   *Coy v. Iowa*
9  487 U.S. 1012 (1988)                                                  33

10 *Crawford v. Washington*
   541 U.S. 35 (2004)                  3, 19, 23-26, 32-34, 39, 40, 43, 44

11
   *Davis v. Washington*
12 547 U.S. 813 (2006)                 19, 23-26, 29-32, 39, 43, 44

13 *Delaware v. Van Arsdall*
   475 U.S. 673 (1986)                                                  33

14
   *Francis v. Franklin*
15 471 U.S. 307 (1985)                                                  47

16 *Fry v. Pliler*
   551 U.S. ___, 127 S.Ct.2321 (2007)                                19, 34

17
   *Harrington v. California*
18 395 U.S. 250 (1969)                                                  33

19 *Hiibel v. Sixth Judicial Dist. Court of Nev.*, Humboldt Cty.
   542 U.S. 177 (2004)                                                  31

20
   *Ohio v. Roberts*
21 448 U.S. 56 (1980)                                               32, 33

22 *People v. Delgado*
   ___Cal.4th ___
23 2008 Cal. LEXIS 6636 at p. * 7 (May 29, 2008)                    42, 44

24 *People v. Duran*
   97 Cal.App.4th 1448 (2002)                              41, 42, 44, 46

25
   *People v. Wheeler*
26 4 Cal.4th 284 (1992)                                                 42

27 *People v.Woodell*
   17 Cal.4th 448 (1998)                                            42, 43

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)

iii

## TABLE OF AUTHORITIES  (continued)

Page

*Richardson v. Marsh*
481 U.S. 200 (1987)                                                47, 48

*Schneble v. Florida*
405 U.S. 427 (1972)                                                    33

*Tennessee v. Street*
471 U.S. 409 (1985)                                                    43

*United States v. Banks*
464 F.3d 184 (2d Cir. 2006)                                            40

*United States v. Massino*
319 F.Supp.2d 295 (E.D.N.Y 2004)                                       40

*United States v. McClain*
377 F.3d 219 (2d Cir. 2004)                                            40

*United States v. Mitchell*
502 F.3d 931 (9th Cir 2007)                                            43

*Whelchel v. State of Washington*
232 F.3d 1197 (9th Cir. 2000)                                          33

*Winzer v. Hall*
494 F.3d 1192 (9th Cir. 2007)                                       33, 34


**Constitutional Provisions**

United States Constitution
    Sixth Amendment                   23, 24, 33, 34, 37, 39, 44, 49


**Statutes**

California Evidence Code
    § 452.5                                                      44
    § 452.5, subd. (b)                                           42
    § 1240                                                   20, 22
    § 1271                                                   42, 44
    § 1280                                                       42
    § 1370                                                   20, 22

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319
PJH (PR)

iv

## TABLE OF AUTHORITIES  (continued)

**Page**

1

2

California Penal Code
           § 136., subd. (c)(1)                                            2
           § 186.22     46
           § 186.22, subd. (b)     41
           § 186.22, subd. (b)(1)     2, 37
           § 186.22, subd. (b)(4)     2, 37
           § 186.22, subd. (e)     41, 46
           § 186.22, subd. (f)     41, 46
           § 213, subd. (a)(1)(A)     1
           § 245, subd. (a)(1)     1, 2
           § 969b     42
           § 1203.06     2
           § 12022.5, subd. (a)(1)     2, 3
           § 12022.53, subd. (b)     2, 3
           § 12022.53, subd. (e)(1)     2

United States Code, Title 28
           § 2254, subd. (d)(1)     19, 25, 40, 43
           § 2254, subd. (d)(2)     25

3

4

5

6

7

8

9

10

11

12

13

14

**Other Authorities**

15

1 Witkin, Cal. Evid.
(4th ed. 2000) Hearsay, § 246, p. 964     44

16

17

29B, Part 4, West's Annot. Cal. Codes
Evid. Code § 1280, Law Revision Commission Comment, at p. 347     44

18

19

20

21

22

23

24

25

26

27

28

*Zuniga v. Felker* - Memo. of P's And A's In Support Of Answer To Petition For Writ Of Habeas Corpus - C-07-4319 PJH (PR)