UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSE ZUNIGA,

        Petitioner,

vs.

TOM FELKER, Warden,

        Respondent.

        No. C 07-4319 PJH (PR)

        **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

## BACKGROUND

Petitioner was convicted by a Santa Clara County jury of two counts of first degree residential robbery, while acting in concert with others, and for the benefit of, or in association with, a criminal street gang, *see* Cal. Penal Code §§ 213(a)(1)(A), 186.22(b)(4); and one count of assault with a deadly weapon, *see id.* at § 245(a)(1). Ex. Z at 1-2.[1] Two co-defendants, William Siller and Gabriel Herrera, were not tried with defendant. After the first full day of testimony, they pleaded guilty to robbery and assault charges and admitted gang activity enhancements.

---

[1] Citations to "Ex." are to exhibits in the record lodged with the court by the Attorney General.

The jury also found that petitioner personally used a firearm during the robberies and the assault. *See* Cal. Penal Code at §§ 12022.53(b), 12022.53(e)(1), 12022.5, 1203.06. He was sentenced to prison for a determinate term of ten years, plus a consecutive term of fifteen years to life. He unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California denied review.

The following facts are excerpted from the opinion of the California Court of Appeal:

> On Christmas Eve, 2002, Salvador Lopez (Lopez), Charlotte Reinthaler (Reinthaler) and Amy Guray (Guray) were assaulted and robbed at Reinthaler's apartment by three men. Lopez and Reinthaler testified at trial. Guray did not testify; however, the statements she made to San Jose Police Officer Jerome Hicks about the events were admitted at trial.
>
> At approximately 10:30 p.m., the three friends were together at Reinthaler's apartment located at 736 East St. James Street in San Jose. [. . .] Reinthaler had known defendant for a few months and understood that he was a member of Capital Park Locos (CPL).
>
> Sometime between 11:00 p.m. and midnight, three men came to Reinthaler's front door. Lopez could see them through a window next to the door. Reinthaler approached the door, but before she could open it, the door flew open and the three men barged in. Both Reinthaler and Lopez saw Guray enter the bathroom shortly before the men entered the apartment.
>
> At trial, Reinthaler could not say who the three intruders were, and could not identify who had pushed her into the kitchen, waving a gun. That person went to the bathroom, from which Reinthaler heard loud banging and Guray screaming. She also heard voices saying something to the effect of "What's up fool? Like give me all your stuff. [P] . . . [P] Break yourself." She heard Lopez say, "Come on, I had nothing to do with this." Reinthaler also knew that Guray's purse was stolen. Reinthaler acknowledged telling police that the three intruders were Cootie, Travieso and Jesse Boy, but claimed that Guray had told her their names.
>
> Lopez identified defendant and co-defendants Siller and Herrera as the three men who came through the door. According to Lopez, defendant was the first one through the door, and he was hollering something about "CPL". He said he was looking for "Sandman" and that he was going to kill someone because someone shot at his car. Siller had a semi-automatic handgun. Herrera stayed at the front door, acting as lookout. Siller pointed the gun at Lopez. Defendant put his hands on Reinthaler's upper body and shoved her into the kitchen. Reinthaler was crying and screaming; she did not leave the kitchen during the incident.
>
> Next, defendant and Siller approached the bathroom, kicked the door in, and entered the room. Lopez could not see what happened inside the bathroom after the men entered, but he heard Guray crying. He did not see either man pick up a purse. When they came out of the bathroom, they told Lopez to "break himself" several times with the gun pointed at him. At the time, he did not know what that phrase meant, but he later learned it means hand over

2

whatever you have.  With the gun still pointing at Lopez, defendant ripped a chain off Lopez's chest.  Herrera also told Lopez to break himself, while reaching for something under his sweater.  Thinking that Herrera might be hiding a gun or a weapon under his clothing, Lopez gave Herrera everything in his pocket, including cash and a kindergarten picture I.D.  Before the intruders left, defendant ripped the phone out of the wall.

After the intruders left, Lopez and Reinthaler went around the corner to use a phone to call Reinthaler's mother, Courtney Craig.  After that, Lopez left and Reinthaler returned to the apartment with her mother.  [. . .]  Reinthaler locked up her place and left with her mother for Ms. Craig's house in Gilroy.  Guray remained there, and sat on top of her car.  She had no car keys.  She wanted to stay in case someone returned to steal her car.

At approximately 1:45 a.m. on Christmas Day, Officer Hicks was sitting in his marked police car, parked at the curb in front of the corner house on East St. James and 17th Streets, when Guray walked up to the passenger side window, knocked on it, and waited for him to make eye contact with her.  To Hicks, she looked fearful.  Her eyes were red and puffy, as if she had been crying.  She was not frantic, but she was visibly upset.  She appeared to have been drinking, but was not under the influence.  She did not appear to be injured.  Nevertheless, Hicks believed that something bad must have happened to her.

Guray told Hicks that she was at 736 East St. James with two friends, Reinthaler and Lopez, whose surname she did not know, when three guys came in and robbed her and her two friends.  She said there was a knock at the door, and when Reinthaler answered it, three males burst into the apartment.  She said she knew all three of them and named them: Cootie, Travieso and Jesse.

Cootie had a silver, semi-automatic hand gun and he pointed it at Lopez.  Guray ran to the bathroom and locked the door.  Jessie kicked the door open and grabbed her, pushing her down on the floor.  He told her to give him her purse and car keys, which were on the floor in front of the bathroom.  She gave them to him because she was fearful and thought he was going to kill her.  Jessie told her that if she called the police he would kill her.  The phone had been pulled out of the wall.  She said the incident happened at approximately 11:00 p.m.

Guray also said she had known the intruders for one week, and knew they were members of the Capital Park Street gang.  She described the intruders and her purse.  She said her purse contained approximately $ 30 in cash, her checkbook, ATM card, California I.D. and ring of car keys.  She knew where Travieso lived.  Guray told Hicks that just before making contact with him, she had been keeping an eye on her car, which was parked in the driveway of Reinthaler's residence.  She was afraid defendant would come back and steal her car.

Officer Hicks spent approximately one hour with Guray.  He went over the events with her approximately three times; there were no significant differences in her statements.  Together, they went to Reinthaler's apartment where Officer Kurtz took pictures, at Hicks's direction, of Guray's car and the damage to the apartment and the bathroom.  Hicks testified that the pictures accurately depicted the scene when he went there and talked to Guray about

3

what had happened.

About a week after the home invasion, San Jose Police Sergeant John Tepoorten showed Lopez some photo lineups, but initially Lopez refused to identify any one because he was afraid of gang retaliation against himself and his family. He told San Jose Police Detective Mike Nasciemento that his brother had been involved in a gang-related incident and was being hunted down by gang members; he did not want the same thing to happen to him. However, he did tell police that someone named "Jesse" had a gun, as did one of the other men. Later, Lopez positively identified defendant, Siller and Herrera as the intruders at the preliminary hearing in April 2003 and at trial.

Reinthaler was interviewed by Detective Nascimento on December 27, 2002, and by Detective Nascimento and Sergeant Tepoorten on December 31, 2002. She was reluctant to cooperate and did not want her name to appear in any police reports. She said she was afraid of Jesse and his two friends whom she knew to be members of the Capital Park gang. She told Nascimento that defendant was the first intruder into the house and that he had pushed her into the kitchen at gunpoint. On December 31, Reinthaler reiterated that she did not want to be involved, but she selected pictures of defendant, Siller and Herrera out of separate photo displays as pictures of the intruders. She seemed afraid to circle the pictures, so Detective Nascimento circled them for her.

Also on December 31, 2002, the police searched William Siller's residence. In a bedroom, they found Lopez's kindergarten identification and Guray's picture I.D, California Benefits card inside a billfold and her medical marijuana card. In addition, the police found a large amount of gang indicia. The names CPL, Capital Park Locos, Travieso, Cootie, Norteno and XIV appeared on some of the items. Photos of Herrera and Siller throwing hand signs were found. None of the indicia referenced defendant.

On January 2, 2003, the police interviewed Guray. She said that Jesse had robbed her, and identified his picture out of a photo lineup.

At trial, Officer Nascimento testified that in 1997 defendant admitted to him that he had been a member of the CPL gang since 1994. A search of defendant's room at that time yielded indicia of gang membership. As far as he knew, defendant remained a member of CPL at the time of trial.

Detective Gregory Lombardo, an expert on San Jose street gangs, testified that CPL was an active criminal street gang of approximately 40 to 50 members and that its primary activities included assaults with deadly weapons, robbery, attempted murder and threats to inflict great bodily injury or death. Detective Lombardo opined that former co-defendants Siller and Herrera were members of CPL. Documentation of Siller's and Herrera's guilty pleas to the two robberies for which defendant was on trial, and of their admissions that they had committed the robberies for the benefit of the gang, was admitted. Based on his review of the current case, defendant's prior admissions of gang membership, prior police contacts and tattoos, and prior convictions for possession of a sawed-off shotgun and admission of a gang activity allegations, Detective Lombardo opined that defendant was a member of the CPL gang, and that the current crimes were committed for the benefit of the gang.

Ex. Z (Unpublished Opinion of the California Court of Appeal, Sixth Appellate District, *People v. Zuniga*, No. H027243 (February 26, 2007)) at 2-8.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at

340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

## DISCUSSION

As grounds for habeas relief petitioner asserts that: (1) admission of certain hearsay testimony violated his Confrontation Clause rights as described in *Crawford v. Washington*, 541 U.S. 36 (2004); and (2) his Confrontation Clause rights were violated by the admission of evidence of the guilty pleas of confederates.

### I.  Admission of Guray's statements

The trial court allowed Officer Hicks to testify about victim Amy Guray's statements to him, although Guray did not testify. Petitioner argues that all of the statements were testimonial, so admission of them violated his Confrontation Clause rights as established in *Crawford v. Washington*, 541 U.S. 36 (2004).

#### A.  Background

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars the admission of "testimonial" statements made by persons who are not subject to cross-examination regardless of whether a hearsay exception would otherwise allow the admission of the statements. *Crawford*, 541 U.S. at 68-69. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (citations and quotation marks omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Although the Court did not precisely define the term "testimonial" in deciding *Crawford*, it did bar the state from introducing out-of-court statements which are testimonial in nature, unless "the declarant is unavailable, and only where the defendant has had a prior opportunity to

cross-examine." *Id.* at 59.

Following *Crawford*, the Supreme Court distinguished testimonial and nontestimonial statements to police, stating that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006)

In *Davis*, the Court addressed statements made by a woman to a 911 operator regarding an assault. *Id.* at 817. Her statements were found by the Supreme Court to be non-testimonial, because the objective circumstances showed that the "primary purpose" of the police interrogation was to meet an ongoing emergency. *Id.* at 827-828. The Court noted that statements in such calls are ordinarily not intended primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance. *Id.* at 827. Moreover, the Court stated that non-testimonial statements could include identifying information given by a victim, even after a suspect has left the scene, because the information permits officers "to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* at 832. In contrast, statements are testimonial when "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

In this case the trial court admitted the statements under the hearsay exceptions for spontaneous statements, *see* Cal. Evid. Code § 1240, and as statements purporting to "narrate, describe, or explain the infliction or threat of physical injury," *see* Cal. Evid. Code section 1370. Reporter's Transcript ("RT") at 710. While the appeal was pending, the Supreme Court decided *Crawford* and *Davis*, causing the appellate court to request supplemental briefing on the application of those cases. Ex. W (Letter from California

Court of Appeal, dated June 20, 2006). In considering the arguments made by the parties, the court of appeal said:

> In our view, this case is not as clear cut as either party suggests, but presents us with the situation presaged by *Davis*, where we are called upon to discern the point at which, for Sixth Amendment purposes, statements made in response to initial inquiries designed to resolve an ambiguous and potentially dangerous situation evolve into full-blown testimonial statements made in response to structured interrogation undertaken for the purpose of investigating a crime. Viewing the situation from an objective point of view, and taking into account the perspectives of both Guray and Officer Hicks, it is reasonable to infer that Guray approached Officer Hicks with the idea of securing his assistance in resolving her predicament - that she was locked out of her car and feared the imminent return of the people who had stolen her keys - and that Officer Hicks perceived that she was seeking assistance of some kind. Thus, the only objectively reasonable inference to be drawn is that his initial inquiries were designed to resolve whether there was some ongoing emergency; whether weapons or violence were involved; and if so, whether the perpetrator or perpetrators were still in the vicinity or at large. Thus, at a minimum, some of Guray's statements - for example, that her car keys had been stolen when three persons she knew as Cootie, Travieso and Jesse came into an apartment nearby and robbed her and her two friends - must be considered nontestimonial. To resolve that, in fact, there was no ongoing emergency, Officer Hicks would have had to learn these basic facts about Guray's immediate situation. However, as soon as Officer Hicks learned that these events had happened hours rather than minutes before Guray contacted him, and he began to elicit details of the events, such as the color of the gun, or who entered first, Guray's statements became testimonial. Thus, we conclude that the balance of Guray's statements to Officer Hicks were inadmissible under Crawford and Davis.

Ex. Z at 14-15.

**B.     Analysis**

    **1.     Initial Statements**

Although *Crawford* does cite "statements made during police investigations" as an example of statements that are "testimonial" in nature, 541 U.S. at 51-52, the Supreme Court in *Davis* specified that not all statements made to police prior to trial are testimonial. *See Davis*, 547 U.S. at 832. Officer Hicks was approached without warning, and thus the initial part of the interaction between the officer and Guray was to allow the officer to assess the situation. He was able to ascertain that Guray had been robbed by petitioner and two others and feared their return because they had her car keys. RT at 697. While these initial statements were apparently made some hours after the actual robbery, they served the same function as the 911 call statements at issue in *Davis,* that is, they

8

"describe[d] current circumstances requiring police assistance." *Id.* at 827. Guray's initial statements thus were nontestimonital, and the court of appeal's conclusion to that effect was correct. Because the statements were nontestimonial, there was no Confrontation Clause violation.

### 2. Subsequent Statements

The court of appeal held that Guray's statements, which at first were in response to an interrogation to determine the need for emergency assistance, did "evolve into testimonial statements." Ex. Z at 15; *see Davis*, 547 U.S. at 828. This was because the rest of the statements at issue were obtained in connection with a police investigation whose "primary purpose [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. The court of appeal concluded, however, that the Confrontation Clause violation was harmless.

When a state court disposes of a constitutional claim as harmless under *Chapman v. California*, 386 U.S. 18, 24 (1967), as the court of appeal did here, a federal court must, for purposes of applying the "unreasonable application" clause of § 2254(d)(1), determine whether the state court's harmless error analysis was objectively unreasonable. *See Medina v. Hornung*, 386 F.3d 872, 878 (9th Cir. 2004); *see, e.g., Campbell v. Rice*, 408 F.3d at 1173 (determining that state court's harmlessness holding was not unreasonable and proceeding no further). If the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the analysis set out in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (habeas petitioner not entitled to relief unless trial error had substantial and injurious effect or influence in determining the jury's verdict). *Medina*, 386 F.3d at 877. The Supreme Court has held that whether a Confrontation Clause error is harmless "depends upon a host of factors" which "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise

permitted, and of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Accordingly, this court now turns to the issue of whether the court of appeal's harmless error analysis was objectively reasonable.

This is what the court of appeal said about the harmless error question:

> The evidence establishing the essential elements of the robbery, assault and firearm use were supplied by those statements of Guray which were not excludable, in combination with Reinthaler's testimony and prior inconsistent statements, Lopez's testimony and corroborative evidence gathered by police. Together this evidence established that defendant was one of the three intruders, that he brandished a gun at Reinthaler, that Guray was inside the bathroom when he broke down the bathroom door, that Guray was screaming, and that her car keys were stolen. Assault, robbery and firearm use were inferable from these facts, with or without Guray's entire statement. The Crawford error was harmless beyond a reasonable doubt.

Ex. Z at 15.

The state court's harmlessness analysis was reasonable. Guray's statements were corroborated by Lopez and Reinthaler. Lopez testified that three individuals entered the apartment of Reinthaler by kicking the door in. RT at 553, 560. Lopez identified petitioner in open court as one of the intruders. RT at 561. Lopez testified that petitioner "threw" Reinthaler into the kitchen. RT at 564. According to Lopez, petitioner then kicked the door of the bathroom Guray had been in before the men entered. RT at 566, 567. Lopez testified he heard Guray crying. RT at 568. Lopez then said petitioner approached him and repeatedly told him to "Break himself" and pointed a gun at him. RT at 572, 574. Petitioner then ripped Lopez's silver chain off his neck. RT at 574. Lopez testified he then handed over everything he had in his pocket, including his kindergarten I.D. card, which was later recovered from Siller's apartment. RT at 577,578, 825-826. Other physical evidence, such as the broken doorjamb to the bathroom, RT at 795, and Guray's I.D. card that was also recovered from Siller's apartment, RT at 825-826, corroborated Lopez's testimony.

Reinthaler testified that someone entered her apartment and that she was pushed into the kitchen. RT at 990. She testified that the person who pushed her immediately went to the bathroom. RT at 994. She testified she heard loud banging and noises in the

10

bathroom where Guray was at the time.  RT at 992.  She testified she also heard the men telling Lopez to give up all his stuff.  RT at 993, 1002.

In light of this evidence, the state court's harmless error analysis was neither contrary to nor an unreasonable application of federal law.  Accordingly, habeas corpus relief is not warranted on this issue.

**II.     Admission of the guilty pleas**

Petitioner claims his right to confront the witnesses against him was violated when the guilty pleas of non-testifying co-defendants Siller and Herrera were admitted for the purpose of establishing that the robberies were "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Cal. Penal Code § 186.22(b)(1).

**A.     Background**

Under the California Street Terrorism Enforcement and Prevention (STEP) Act, California law imposes sentence enhancements for felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang," by a defendant with "specific intent to promote, further, or assist in any criminal conduct by gang members."  Cal. Penal Code § 186.22(b).

California Penal Code section 186.22(f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in subdivision (e) of the statute, the 'predicate offenses'] . . . and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  *Id.* at § 186.22(f).  Robbery qualifies as a predicate offense.  *Id.* at § 186.22(e)(2).  The second requirement is at issue here – that the group's members must "engage in or have engaged in a pattern of criminal gang activity."  *Id.* at § 186.22(f).

Under the statute, the pattern of criminal gang activity can be established by proof of "two or more" predicate offenses committed "on separate occasions, or by two or more

11

persons." *Id.* at § 186.22(e). The Legislature's use of the disjunctive "or" indicates an intent to allow the prosecution the choice of proving the requisite pattern by evidence of two or more predicate offenses committed on separate occasions or by evidence of such offenses committed by two or more persons on the same occasion. *People v. Loeun*, 17 Cal. 4th 1, 10 (1997).

Here, along with evidence of other crimes committed by Capital Park Locos ("CPL") gang members, the prosecutor introduced exhibits thirty-seven and thirty-eight, certified minute orders reflecting Herrera's and Siller's guilty pleas to the robberies of Guray and Lopez, and their admissions to personal firearm use and to gang allegations. RT at 1297-1298. The court gave the following limiting instruction on exhibits thirty-seven and thirty-eight:

> "The exhibits that are marked 37 and 38, which you will see in the jury room, they are the copies [of] the guilty pleas and admissions of Siller and Herrera, co-defendants. They have been presented by the People to show a pattern of criminal activity. They are not to be considered by you as proof that the defendant had a specific intent to promote, further, or assist in any criminal conduct by gang members, or that the crimes charged were committed by the defendant for the benefit, at the direction of, or in association with a criminal street gang. So that is limited."

RT at 1356.

Petitioner maintains that evidence of the guilty pleas by Siller and Herrera was the functional equivalent of prior testimony, and therefore that admission of it was prohibited under *Crawford* because neither Siller nor Herrera was available for cross-examination.

The Court of Appeal held that the court records reflecting Siller's and Herrera's guilty pleas and convictions were non-testimonial evidence, so their admission did not implicate the Confrontation Clause. Ex. Z at 23-24.

**B.     Analysis**

In *Crawford*, the Supreme Court turned to history as a guide to interpreting the Confrontation Clause, and concluded that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*,

12

541 U.S. at 51 Id. at 53-54.  Thus, admissibility under the Sixth Amendment turns on whether the evidence in question is testimonial in nature:

> "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether . . .  Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."

*Id.* at 68.

Although the *Crawford* Court declined to explain definitively the distinction between testimonial and nontestimonial hearsay, it did provide some examples of nontestimonial statements, including those of "'business records or statements in furtherance of a conspiracy.'" *United States v. Cervantes-Flores*, 421 F.3d 825, 832 (9th Cir. 2005) (quoting *Crawford*, 541 U.S. at 56); *see also Crawford*, 541 U.S. at 76 (Rehnquist, C.J. concurring) (interpreting the majority's exceptions as including official records as well as business records).  Under this precedent, "public records . . . are not themselves testimonial in nature and . . . these records do not fall within the prohibition established by the Supreme Court in *Crawford*." *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005).

The Ninth Circuit has interpreted *Crawford* to hold that government records which existed prior to a criminal prosecution ("much like business records") are not testimonial because they are "part of a class of documents that were not prepared for litigation" and do not "involve live out-of-court statements against a defendant elicited by a government officer with a clear eye to prosecution." *Cervantes-Flores*, 421 F.3d at 832-33 (holding that "certificate of nonexistence of record" was nontestimonial); *see United States v. Norwood*, 555 F.3d 1061, 1065-66 (9th Cir. 2009) (certificate of nonexistence of record that defendant had received taxable wages for the period in question was nontestimonial and admissible under the Sixth Amendment).

Here, the trial court admitted "certified [copies] of a court document" reflecting the guilty pleas. RT at 1297-1298; Clerk's Transcript ("CT") at 67, 69.  These court documents were not made in anticipation of future litigation, but instead were records that are routinely

made by a governmental agency. *See United States v. Ballesteros-Selinger*, 454 F.3d 973, 975 (9th Cir. 2006) (holding that an immigration judge's deportation order was nontestimonial because it "was not made in anticipation of future litigation"). Because Siller's and Herrera's guilty pleas and convictions were not testimonial, admission of evidence of them did not implicate the Confrontation Clause.

In addition, such claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002)(citing *Brecht*, 507 U.S. at 637).

Here, there was unrebutted and compelling evidence that the robberies were committed for the benefit of, or in association with, a criminal street gang, and that they were committed with the specific intent to promote, further, or assist in criminal conduct by gang members. Officer Gregory Lombardo testified that in his opinion CPL is an ongoing criminal street gang and he explained the bases for his opinion. RT at 1286. Officer Lombardo testified about the four above-mentioned offenses that CPL members, including the petitioner, had committed that he considered gang-related and he testified as to the bases of his opinions. RT at 1287-1292. Officer Lombardo testified that in his opinion the robberies of Guray and Lopez were gang-related due to petitioners' admission of membership in CPL to other officers, RT at 1298-1300, the petitioners' gang tattoos, RT at 1300-1303, the fact that the victims knew the robbers to be CPL gang members and specifically reported the robbers as stating "we are CPL" when they entered. RT at 1311. Further, Officer Lombardo testified that CPL gang members thrive on intimidation and bold acts "knowing that [their victims] are afraid of [them] and they probably won't report it to the police." RT at 1311.

Moreover, the jury was given a limiting instruction. The jury was instructed to consider the pleas only to "show a pattern of criminal activity," i.e., as predicate acts. Records of four other convictions were admitted as evidence of predicate acts - two

14

convictions for attempted murder and one for assault with a deadly weapon. RT at 1287-1290, 1341. Also admitted was a prior conviction of the petitioner himself. RT at 1292, 1341. Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997).

Because of the strong evidence in support of the two gang elements and the limiting instruction, the court concludes that admission of the co-defendants' guilty pleas did not have an actual and prejudicial effect on the jury. Even if there was constitutional error, it was harmless.

Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: October 26, 2009.

PHYLLIS J. HAMILTON
United States District Judge

P:\PRO-SE\PJH\HC.07\ZUNIGA4319.RUL.wpd

15